Janet WILLIAMS, Plaintiff,

v.

Albert V. CASEY, Postmaster
General, Defendant.

No. 85 Civ. 2822 (RWS).

United States District Court,
S.D. New York.

July 21, 1988.

Stevens, Hinds & White, P.C., New York City, for plaintiff; Lennox S. Hinds, Aaron D. Frishberg, of counsel.

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, for defendant; David R. Lewis, Asst. U.S. Atty., of counsel.

### OPINION

SWEET, District Judge.

Plaintiff Janet Williams ("Williams") has alleged violations of 42 U.S.C. § 2000e–5 *et seq.* and the [Handicap] Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, arising out of discrimination based on handicap and on reprisal by defendant Albert V. Casey, Postmaster General (the "Postmaster" or the "Service"). These allegations were tried before the court on May 16–18, 1988. On the facts and conclusions set forth below, Williams' complaint will be dismissed without costs.

*Prior Proceedings*

Williams *pro se* initiated this action on April 12, 1985. On April 25, 1985 her application to proceed *in forma pauperis* and for the appointment of counsel was denied. By November 12, 1985 Williams obtained able counsel, the discovery period was extended, and the amended pleadings were filed. The representation of Williams has been able, effective and in the best tradition of the bar, particularly given the difficulties created during the period while Williams sought to represent herself as indicated by the facts found below.

Williams' earlier claims of discrimination on the basis of age and gender were abandoned. The earlier claims asserted against one of her supervisors, John Burrell ("Burrell") in his individual capacity was dismissed by order of this court. *See* Opinion, March 26, 1987, published at 657 F.Supp. 921, 926 (S.D.N.Y.1987); stipulation and order, November 24, 1987.

As refined in the pretrial order, this action is based on five separate administrative Equal Employment Opportunity claims ("EEO" claims) which grow primarily out of disciplinary sanctions imposed against Williams. The issue is presented as to whether the disciplinary action imposed was retaliatory and whether the conduct of the Service constituted discrimination against Williams as a handicapped employee.

*The Facts*

Williams has been employed by the Service since 1969. Since 1974 up to the time of the events recounted here, Williams was a clerk assigned to the Morris Heights Station in the Bronx. During that period her duties have been those of a window clerk. Williams is a middle aged black woman, pleasant in appearance and demeanor. Prior to 1982 her disciplinary record was unblemished.

The Service obviously conducts extensive national operations in collecting and distributing mail. It maintains progressive discipline for its thousands of employees with the aim of correcting, rather than punishing their conduct. The disciplinary procedures are to some degree the result of

collective bargaining. Disciplinary files for employees are maintained for three years, and after two years without disciplinary action the record of prior action is expunged. As of April 1986 Williams' record was, in the vernacular of the Service's managers, "clean."

The first step in the Service's administration of progressive discipline is a letter of warning issued by the employee's immediate supervisor which can be resolved after conference with the employee, the union delegate, and the supervisor. The second level of discipline consists of suspension, first for up to 7 days, then up to 14 days. The employee has the right to file a grievance which is heard by the labor relations director of the Service. The final disciplinary step is removal which is subject to arbitration. The disciplinary process does not encompass claims of discrimination.

Such claims are filed with the Equal Employment Opportunity Office of the Service ("EEO"), investigated and determined. Under the applicable regulations, any discrimination complaint must be brought to one of the Service's EEO counselors within 30 days of the acts complained of. See 29 C.F.R. §§ 1613.213-.214. If this "informal complaint" cannot be resolved at this threshold, the complainant must file a formal complaint with the EEO branch of the Service. 29 C.F.R. § 1613.214. Following an agency investigation, if relief acceptable to the complainant is not offered, the complainant may request an evidentiary hearing before an examiner who is not employed by the Service. See 29 C.F.R. §§ 1613.215-.218. Final decision is entrusted to the Postmaster General or his official designee. 29 C.F.R. § 1613.221. The complainant may appeal the agency's final decision to the EEOC within 20 days, or a civil action may be commenced directly in federal district court within 30 days. 29 C.F.R. §§ 1613.233, 1613.281.

The conflict between Williams and the Service began modestly and progressed over time to the full-blown lawsuit which is the subject of this opinion. It started with the filing of an informal EEO complaint by Williams on February 24, 1982 to the effect that she had not received sufficient assistance during the 1981 Christmas rush, had been harassed by her supervisors, and denied pay for sick leave and jury duty. The claim was not pursued, and no discrimination was set forth.

On May 14, 1984 a Letter of Warning was issued to Williams by her then-supervisor, Alex Iorio ("Iorio"). The charges in that letter included: (1) carelessness, (2) delay of mail, (3) failure to follow instruction, and (4) unauthorized extension of lunch break. Iorio had previously spoken to Williams who felt that she was being picked on and who had responded to criticism by stating: "We will overcome." Iorio based the Letter of Warning on an incident where Williams had tripped over a package, sought medical assistance, and was indifferent to the instruction to limit her lunch hour to the prescribed length during a period of heavy mail volume.

On June 6, 1984, Williams commenced EEO Claim No. 1-1-0967-4, seeking rescission of the Letter of Warning issued to her on May 14, 1984. The EEO Branch of the Postal Service rejected this claim by letter dated August 22, 1984, on the ground that plaintiff had failed to state a cognizable claim because she had failed to allege discrimination on the basis of race, color, religion, sex, national origin, reprisal, age or handicap. By letter dated September 24, 1984 and received October 1, 1984, Williams appealed this determination to the Equal Employment Opportunity Commission ("EEOC").

On June 12, 1984, Williams filed EEO Claim No. 1-1-0969-4, complaining of two things: 1) removal of a steel work table from the registry cage where she was working, and 2) the change in Williams' close-out time from 2:00 to 2:30. The decision to remove the steel table from the registry cage was the result of the demise of a wooden "key table," and Burrell chose to replace it with the one in the registry cage because: 1) the other table was being shared by two clerks, and 2) the registry work station had two to three times as much counter space as the other work stations. Williams' closing time was moved

from 2:00 to 2:30 to accommodate routine scheduling needs and left Williams a full 45 minutes to check out of her drawer. This claim was consolidated for administrative purposes with the June 6 claim.

Williams appealed Claims Nos. 1–0967–4 and 1–1–0969–4 to the EEOC. On appeal, Williams identified reprisal as the basis of the discrimination. EEOC issued an administrative decision on February 19, 1985. The final EEOC decision denied Williams' claim on the ground that the claim had been filed with the EEOC in an untimely manner. On September 11, 1984, Williams had written to the Northeast Manager, EEO Branch, requesting an extension of her time to file an appeal on the ground that other clerk's vacation schedules had caused a shortage, so that she was denied time for personal business. This request was made within twenty days of August 27, 1984, the presumed date of Williams' receipt of the Postal Service's August 22, 1984 decision. This request was not forwarded to EEOC, but a letter was sent to Williams, dated September 26, 1984, which pointed out that EEOC had jurisdiction over extensions of time to appeal. Williams' appeal to EEOC was dated September 19, 1984, and according to EEOC, was postmarked September 24, 1984.

In appealing to EEOC on these cases, Williams complained of a continuing pattern of harassment by Burrell. "There are numerous things he has done against me and its too hard to show because the next day it's over and when I call the union they say call them if it happens again."

On July 13, 1984, Arthur Carucci ("Carucci"), the Manager of Employee and Labor Relations of the Service, wrote Williams scheduling a fitness for duty examination for her on July 19 by a Dr. Goldart, who turned out to be a psychiatrist. Neither Burrell nor Morris Heights station manager Robert Scelzo ("Scelzo") had any knowledge of the examination or its scheduling. By letter of March 13, 1985 to the EEOC, Williams requested reopening of her cases and complained of being sent for a medical examination to a psychiatrist.

A second Letter of Warning was issued by Burrell on October 12, 1984 and related to the delivery of a piece of registered mail to the wrong person. Burrell, as Williams' immediate supervisor, signed this second Letter of Warning after it was prepared by others and sent to him for issuance following an investigation by the Service investigative office. Burrell had also received a Letter of Warning arising out of these events after he discussed with Williams and a postal carrier the possibility of improperly covering up the misdelivery.

This action as set forth above was commenced *pro se* on April 12, 1985.

The third disciplinary notice issued against Williams was a 7–day Notice of Suspension issued May 20, 1985. The basis of this suspension was Williams' refusal on May 15, 1985 to comply with instructions from Scelzo to confine her use of a stool to those times when she was not actually servicing customers. Some weeks prior to May 15, 1985, the Bronx Postmaster after a visit to Morris Heights had instituted a practice barring window clerks from sitting on stools while actually engaged in serving customers, who arrived intermittently from a nearby bus stop and train platform. The practice was based on concerns of safety, public image, and speed of serving. When not serving the public, use of a stool was allowed and the typical window clerk has his or her window open only five and one-half hours per shift. All employees, including Williams, were advised of the practice and a sign was posted setting it forth. After the instructions were issued Scelzo admonished Williams on a number of occasions to stop serving customers while seated.

On May 15, 1985 Scelzo admonished Williams twice not to continue serving customers from a seated position. On both occasions Williams made no reply, even after Scelzo inquired as to whether there was anything wrong. The third time Scelzo instructed Williams, she leapt from the stool, knocking it over, and demanded to go to the doctor. Scelzo complied with the demand. After the issuance of the Notice of Suspension, Williams complained of an

occasional need to work from a stool and provided medical evidence to substantiate the request. She was thereafter allowed to sit when necessary and was even occasionally relieved from window duty and reassigned to other jobs where sitting was more practical.

On June 19, 1985 Williams commenced EEO Claim No. 1–2–0916–5 seeking rescission of the 7–day suspension of May 20, 1985 (which later became a 2–day suspension following the grievance procedure) issued to her. The final administrative decision, issued by the EEOC on April 16, 1987, denied Williams' claim on the merits.

The next disciplinary notice issued to Williams was a 14–day Notice of Suspension issued on July 16, 1985, for failure to return promptly unclaimed pieces of Express Mail. However, Burrell rescinded this notice within a matter of days at "Step 1" of the labor-contract grievance, having determined that there existed some ambiguity as to who was responsible for returning the particular Express Mail in question.

On July 18, 1985, Burrell by letter advised Williams that she would be held responsible for a credit error on April 23, 1985 with respect to a money order in the amount of $405. Burrell thereafter sent an explanatory letter on Williams' behalf to the Service's Finance Office and held the letter of demand in abeyance until the matter cleared up. The matter was resolved without payment by Williams.

EEO Claim No. 1–2–0004–6 was filed by Williams on July 26, 1985 in which Williams complained of a 15–minute change in her lunch period and a 15–minute change in her window close-out time. No evidence was offered to support the allegation that actions of the Service were in any way discriminatory. No further action was taken.

A second 14–Day Notice of Suspension was issued to Williams on October 1, 1985 by Scelzo after he witnessed an incident on August 16, 1985 in which Williams became belligerent and defiant and ultimately threatened an acting supervisor that she "would have his job so fast he wouldn't know what hit him." The acting supervisor, Jamie Merizalde ("Merizalde") had directed Williams to keep her window open a little later than usual at the lunch hour. Williams failed to follow instructions and threatened the supervisor twice in front of customers and other workers.

Williams filed a labor-contract grievance which was denied at Step 1, Step 2 and Step 3. Williams proceeded to arbitration where the arbitrator overturned the 14–day suspension finding that the instructions issued to plaintiff that day were contradictory, and that the work environment was tension-inducing. Reference had been made to Williams having been locked in the ladies room. The arbitrator corroborated the incident, noting that Scelzo had unlocked the door to free her.[1] The arbitrator noted Williams' testimony that on another occasion she had found a contraceptive on her telephone. The arbitrator concluded:

> It was small wonder that Williams had become excitable and highly charged. Between the changes in instructions to her lunch period, the lack of a pleasant relationship with other employees, responsibility to three supervisors with conflicting orders, and finally the insidious and underhanded "tricks" placed on her were sufficient to cause an emotional outcry on her part, had a legitimate request of her supervisor to check the time to close the window, before she did so.

The Arbitrator ordered the 14–day suspension expunged and the lost wages restored.

On November 12, 1985 Williams filed EEO Claim No. 1–2–0209–6 relating to events on August 16, 1985 which had given rise to the second Notice of Suspension just described. On this occasion she charged Burrell with having fomented criticism of Williams by a co-worker, even though Burrell had already left the station. Burrell left work early that day with a skeleton crew on duty and left Merizalde in charge.

---

**1.** The ladies' room door became a feature of this litigation also. It was defective but became, in Williams' understanding, an element of her perceived harassment.

The claim was denied at the informal stage, at the EEO Branch and by the EEOC.

The sixth disciplinary notice issued to Williams was a Notice of Removal dated April 14, 1986. This was the second disciplinary action that was originated by Burrell and the sole disciplinary action that Burrell did not later rescind. On the morning of March 26, 1986, no clerk was available to open a second service window at the usual time of 10:15 a.m. Williams told Burrell that if he did not immediately assign another clerk to a second window, she would go to the doctor. According to Burrell and Scelzo, Williams' requests to see the doctor correlated on a number of occasions with her receipt of instructions she did not like. Williams refused to return to her window and insisted on placing an immediate call to the union representative after having requested and been granted permission to see the doctor. Williams also refused Burrell's instructions to check out. Williams returned from the doctor at 2:20 p.m., having been certified "Fit for Duty." Williams' union grievance was again settled at Step 2. Although the grievance was denied, the Service extended leniency and settled the grievance by modifying the removal to a 26–day suspension.

On April 25, 1986, Williams commenced EEO Claim No. 1–2–0834–6 seeking to have the Notice of Removal of April 14 rescinded, alleging discrimination on the basis of reprisal and physical handicap. She complained that she had left her postal window to request permission of Burrell to go to the doctor, that the request was denied, that she had then asked for help on her window because she didn't feel well, and that this request was also denied. She further claimed that as she walked back to her window, Burrell demanded that she follow him to the office. She claims that although she then told him she was going back to her window, he stated three times, "Go back to your window," and then charged her with disobeying an order. This order led to a notice of removal being issued.

The final agency decision of the EEO Branch of the Service was issued on April 22, 1987; that decision denied Williams' EEO claim on the merits. The EEO Branch concluded that Williams was not certified as a handicapped employee and that she claimed to be capable of performing all her job duties. In addition, the EEO Branch found that the Service had still made appropriate efforts to accommodate her physical limitations. Finally, the EEO further found that Williams had been disciplined for legitimate non-discriminatory reasons.

Williams' medical file establishes a pattern of physical complaints from 1977 on, including muscle strain, bursitis, arthritis, hypertension and sarcoidosis, stated in one report to be "a chronic granulomatous disease of unknown etiology." A number of claims of job related injury were made, none of which were granted, although Williams was placed on light duty.

By July 7, 1986 Scelzo made the following handwritten request:

I would like to request a "Fitness for Duty" exam for the above clerk [Williams].

Her rate of performance (*any* function) is horrendous and she uses her illness as a reason.

Also she complains that she *can't* lift one tray of mail at a time.

She also *can't* stand at her window or case.

Thank you.

The Service recognizes the need to accommodate handicapped employees and has done so in accordance with its procedures and directives which require a request for certification as a handicapped person, an examination and a finding by the medical officer. Despite her frequent claims of incapacity and requests for medical examinations, Williams made no application for such certification.

There is no direct evidence from any source, other than Williams, that the disciplinary proceedings described above constituted retaliation for the filing of her discrimination complaints. Williams submitted no evidence of retaliation other than the sequence of events and her subjective inference.

Indeed, the facts establish that the shoe was on the other foot and that Williams sought to employ the EEO process as a means to rectify the disciplinary action which she believed to be unwarranted. Her claim of discriminatory treatment by Burrell and Scelzo has not been established factually, whatever their disciplinary objectives may have been. No record of satisfactory performance by Williams has been established, nor has it been established that she was treated differently from or in a more discriminatory fashion than other similarly situated employees.

The evidence has established that Williams has a concern for her health that is greater than is warranted by the medical findings, that she is proud and sensitive and takes umbrage at criticism of her performance, and that she became convinced that her problems were not of her making but resulted from a conspiracy by her supervisors in which on occasion her fellow employees entered. Her belief in this regard was sincere, misguided, and resulted in her effort to achieve vindication in a fashion which has been regarded by her supervisors and fellow employees as malingering. Her job performance has been substantially marred by her efforts to impose her view of her duties and responsibilities upon her supervisors.

While undoubtedly frustrated and angered by Williams' course of conduct, her supervisors disciplined Williams in accordance with the practices of the Service in an effort to improve her performance by imposing penalties for conduct which they deemed inappropriate. Burrell and Scelzo were credible witnesses, frustrated by Williams' conduct. They sought to improve the performance of the employees at the Morris Heights station. Neither Burrell, who is black, or Scelzo who is white, both of whom were male, were shown to have any discriminatory animus.

*Conclusions*

The Applicable Standards

The ultimate and dispositive inquiry in this case is whether the defendant intentionally discriminated against the plaintiff, that is, whether the Service treated Williams less favorably than other employees because of her physical maladies or in reprisal for her filing of previous discrimination claims. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *Wade v. New York Telephone Co.,* 500 F.Supp. 1170, 1174 (S.D.N.Y.1980) ("[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment)."

Initially Williams was required to establish a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Once such a *prima facie* case is established, the burden shifts to the Service " 'to articulate some legitimate, nondiscriminatory reason for [plaintiff's discipline].' " *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). This burden is simply one of articulation or production, not a burden of proving the absence of a discriminatory motive. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978) (per curiam); *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980). If the Service meets this burden, the burden shifts back to Williams who must prove by a preponderance of the evidence that the nondiscriminatory reasons proffered by the Service for the discipline are a pretext for discrimination rather than the actual reasons for the discipline. *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas Corp., supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

■ To establish a *prima facie* case of retaliatory discipline under Title VII, Williams must show that (1) she had previously engaged in protected activity such as by filing discrimination claims and that the Service was aware of such claims; (2) she was disciplined; and (3) a causal connection existed between the protected activity and the discipline. *DeCintio v. Westchester County Med. Cntr.,* 821 F.2d 111, 115 (2d

Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 455, 98 L.Ed.2d 395 (1988); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980).

With regard to discipline based on a violation of a rule of the work place, Williams must show that either she did not engage in the proscribed activity, or that if she did, similarly situated employees who were not members of a protected group were not punished. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.) (per curiam), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980). Williams has the burden to show a similarity between her conduct and that of non-protected employees who were treated differently; it is not incumbent upon the Service to disprove their similarity. *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 603 (8th Cir. 1983), *cert. denied,* 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984).

■ To establish a *prima facie* case of discrimination based upon failure to accommodate a handicap, Williams had to prove that her alleged handicap was known to the employer, that she was otherwise qualified for the position she held, and that the Service failed to reasonably accommodate her handicap. *See* 29 C.F.R. 1613.704; *Prewitt v. United States Postal Service,* 662 F.2d 292, 307–08 (5th Cir.1981). In making these showings, the applicable definition of an "individual with handicaps" is any person who: "(1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B); *see* 29 C.F.R. § 1613.702(a), (d), (e). Thus, Williams, as an element of her *prima facie* case, had to establish the existence of an impairment that substantially limited a major life activity. *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 (6th Cir.1985).

**Williams is Limited to Exhausted Claims**

■ Under both Title VII and the Rehabilitation Act, a civil action may be commenced in federal district court only if the claimant's administrative remedies have been fully exhausted. 29 C.F.R. § 1613.281; *see Brown v. General Services Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Prewitt, supra,* 662 F.2d at 303. Only those matters raised in two specific EEO claims, Claims Nos. 1–2–0916–5, filed June 19, 1985, and 1–2–0834–6, filed April 25, 1986, are properly before this court.

The first EEO claim, filed February 24, 1982 was never pursued beyond the informal level. EEO Claim Nos. 1–1–0967–4 and 1–1–0969–4 were both untimely and failed to state a cognizable claim. Claim No. 1–2–004–6 sought only changes in lunch and window hours and is apparently not pursued here. Claim No. 1–2–0209–6 sought rescission of a 14–day suspension, which the parties stipulate has already been rescinded through arbitration.

**Williams Failed to Establish Discrimination Against Her as a Handicapped Employee**

■ As set forth above, an element of a *prima facie* case of discriminatory failure to accommodate a handicap is that such handicap "was known to the employer." PTO, Legal ¶ 11; 29 C.F.R. § 1613.704; *Prewitt, supra,* 662 F.2d at 307–08. Williams presented no evidence that prior to May 15, 1985 she properly informed her employer that she required accommodation regarding the use of a stool and requested medical certification as a handicapped person.

Moreover, Williams herself revealed that after May 1985, when she did apprise the Service of her occasional need to use a stool due to periodic pain in her knees, Williams was allowed use of a stool and was even periodically relieved of window duty altogether and was eventually moved to a job where she could sit all the time.

**Williams Failed to Establish Discrimination by Retaliation**

■ As set forth in the facts found above, Williams failed to offer evidence to establish that she was properly performing

her job and that she was treated differently from other employees, *i.e.*, that other employees who committed infractions comparable to those committed by Williams were not comparably disciplined. In addition, the Service has demonstrated legitimate nondiscriminatory reasons for all actions taken with respect to moving the steel counting table or the changes in Williams' lunch and window hours. Faced with a renewed burden to show that the reasons articulated by the Service for its actions were pretextual, Williams offered only her own conclusory statements which were insufficient to meet her burden.

Upon these findings and conclusion the complaint must be dismissed without costs. Enter judgment on notice.

It is so ordered.