Daryl F. CHEATWOOD, Plaintiff,

v.

ROANOKE INDUSTRIES, Defendant.

No. CV94–H–2253–E.

United States District Court,
N.D. Alabama,
Eastern Division.

July 20, 1995.

Clarence F. Rhea, Donald R. Rhea, Richard A. Rhea, Gina D. Coggin, Rhea Boyd & Rhea, Gadsden, AL, for plaintiff.

Jake B. Mathews, Jr., Merrill Merrill Mathews & Allen, Anniston, AL, Richard P. Decker, Peter V. Hasbrouck, Decker & Hallman, Atlanta, GA, for defendant.

## MEMORANDUM OF OPINION

HANCOCK, District Judge.

The court has before it the May 17, 1995 motion for summary judgment filed by defendant Roanoke Industries ("defendant"). Pursuant to the court's order of May 17, 1995, the motion was deemed submitted for decision, without oral argument, as of June 14, 1995.

Plaintiff Daryl Cheatwood ("plaintiff") commenced this action on September 15, 1994 by filing a two count complaint. In Count One plaintiff asserts that defendant discriminated against him on the basis of a disability in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq.* by refusing to allow plaintiff to return to work on February 8, 1994. In Count Two plaintiff alleges that defendant terminated him for filing a workers' compensation claim in violation of Alabama Code § 25–5–11.1. In support of its motion for summary judgment, defendant submitted deposition excerpts of plaintiff Daryl Cheatwood, Kenneth Kirby, and Royann Hodges; the transcript of plaintiff's workers' compensation trial on August 19, 1993; the judgment from plaintiff's workers' compensation trial; plaintiff's EEOC charge; a memo from the EEOC dated April 11, 1994; the response of defendant to the EEOC charge; and an April 6, 1994 letter from plaintiff's workers' compensation attorney. In opposition to the motion for summary judgment, plaintiff submitted his affidavit; the affidavit of his brother David Cheatwood; excerpts from the depositions of plaintiff, Royann Hodges, and Kenneth Kirby; the July 23, 1992 vocational evaluation report of Jane Logan; the affidavit of Lynn Carpenter, a rehabilitation specialist; defendant's response to the EEOC regarding plaintiff's charge of discrimination; and defendant's responses to plaintiff's interrogatories.

■ Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2510–11.

■ The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick,* 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir.1991) (*en banc*)).

■ If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick,* 2 F.3d at 1115. If the moving party makes such a showing, the burden shifts to the non-moving party to

produce significant, probative evidence demonstrating a genuine issue for trial.

■■■■ If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. If the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick,* 2 F.3d at 1115–16. The affirmative showing may be accomplished by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories or failure to respond to interrogatories; requests for admission and responses thereto; and other exchanges between the parties that are in the record. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991); *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

The gravamen sought to be redressed in the complaint occurred on February 8, 1994. However, due to the nature of plaintiff's claims, the events of that date cannot realistically be viewed in a vacuum. Thus, the following undisputed facts are presented as background of the events underlying this suit.

■■■ Defendant Roanoke Industries is an industrial manufacturer of plastic parts and moldings. Defendant hired plaintiff in July of 1989 as a "mixer man," and eventually promoted plaintiff to the position of "machine operator" on its 280 machine. (Deposition of Daryl Cheatwood at pp. 23–25, 34) ("Plaintiff's Depo."). The 280 machine was used to make products such as playground equipment and 60 gallon tanks. (Transcript of Plaintiff's Workers' Compensation Trial at p. 6) ("Transcript"). The job of machine operator requires significant bending, stooping, lifting, and stretching as well as constant lifting of powder material of various weights and placing that material into a mold. (Deposition of Kenneth Kirby at p. 12) ("Kirby Depo."). As a machine operator on the 280 machine, plaintiff stood for the entire 8 hour shift and routinely lifted objects of up to 110 pounds as many as twenty times a day. (Plaintiff's Depo. at pp. 33, 35–39).[1]

On July 23, 1991, plaintiff was injured on the job when the ladder upon which he was standing collapsed. (Plaintiff's Depo. at p. 42). Plaintiff remained out of work due to this injury; and on January 19, 1992 plaintiff underwent back surgery. (Plaintiff's Depo. at p. 46). Plaintiff's doctor stated that he had reached maximum medical improvement as of June 9, 1992, and the doctor released plaintiff with a permanent 25 pound lifting restriction and permanent restrictions on repetitive stooping, bending, and lifting.

---

1. In his June 7, 1995 affidavit, plaintiff states that "[i]t was only on rare occasions that I had to manipulate a hundred pounds while working as a machine operator." (Affidavit of Daryl Cheatwood at ¶ 1). Plaintiff cannot create a material issue of fact by filing a contradictory affidavit where he has previously testified under oath that he was frequently required to lift 110 pounds up to twenty times in an 8 hour shift. Plaintiff's affidavit offers no explanation why his previous response to a clear question regarding the weight frequently lifted while working as a machine operator is not correct. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.,* 736 F.2d 656 (11th Cir.1984).

(Plaintiff's Depo. at pp. 46–49; Transcript at pp. 2, 33). Plaintiff testified that as of June 9, 1992, he was not sure he could have performed his previous duties as a machine operator. (Plaintiff's Depo. at pp. 49–50).

Plaintiff filed a workers' compensation claim in the Circuit Court of Randolph County, Alabama in connection with his July 23, 1991 injury. Defendant Roanoke Industries was a defendant to that action. (*See* Judgment, Circuit Court of Randolph County, Alabama, CV 92–067). On August 19, 1993, plaintiff testified in the Circuit Court of Randolph County in connection with his workers' compensation claim. (*See* Transcript of Workers' Compensation Trial). The plant manager from Roanoke Industries, Kenneth Kirby, was present at the hearing and heard plaintiff testify about his physical limitations resulting from the injury. (Kirby Depo. at p. 28). On that date, six months before the operative facts that give rise to this suit, plaintiff gave sworn testimony as follows:

Plaintiff stated that he could not lift any objects weighing more than five pounds without experiencing radiating pain and losing grip of the object;[2] and he could not stand at the sink to wash a glass without significant pain.[3] Plaintiff was unable to make up his bed or clean his room because he could not bend without pain.[4] Plaintiff testified that his doctor gave him a 25 pound lifting restriction, as well as restrictions on bending, stooping and driving long distances.[5] Plaintiff stated that he was unable to sit or stand for very long without extreme pain.[6] Plaintiff needed a fifteen to twenty minute break to walk around if he sat in a chair for over an hour. (Transcript at p. 23). Plaintiff testified that he must lie down on the floor at least five or six times a day for twenty minutes at a time. (Transcript at p. 24). Plaintiff was unable to do any house work.[7] Plaintiff also stated his pain was constant and growing progressively worse over time.[8]

2. At his August 19, 1993 hearing, plaintiff testified: "This arm is limited to about five pounds of sugar, that's about the maximum I can pick up with it. The pain radiates. ... It's like I'm being shocked or something. If I try and pick something up, I loose grip on it. My muscles don't really work. If it's something light, I can pretty well hang on to it. But if it's something over five pounds, I don't have any control over it. The pain is so intense." (Transcript at p. 20).

3. Plaintiff testified, "I might wash a glass or something, but as far as standing at the sink and washing dishes, the stooping over the sink is what kills me. It hits me in my back and someone will tell me to get out of the way." (Transcript at p. 30).

4. Plaintiff testified, "[b]ending is a serious problem. If I try to bend over a bed or something, I fall onto the bed. So, that kills that." (Transcript at p. 30).

5. Plaintiff stated: "The only exercise I'm to do is walking. I'm not supposed to sit, stand, stoop, bend, or anything for long periods of time. And, as his honor will find out in there, I'm limited to lifting 25 pounds. And, I'm not supposed to do it even once a day." (Transcript at p. 17).

6. Plaintiff testified "[g]oing through the day, like I say all I'm allowed to do is walk. Any extended periods of sitting like this or standing or anything becomes uncomfortable. The pain is constant no matter what I do. Whether I'm standing, sitting, walking, there is no way I've been able to make the pain stop." (Transcript at p. 16). When asked how long he could stand plaintiff replied, "15 minutes, if I'm allowed to move around. Standing still, I can't do that much because I lean to the left." (Transcript at pp. 17–18).

7. Plaintiff's testimony regarding his ability to work around the house is as follows:

> Q. Are you able to do any work during the day?
> A. If you call emptying ashtrays for my mother or opening the door for her as she takes the garbage out doing something, yeah. But, is that a life for a human being?
> Q. Do you do any labor, any jobs, anything like that?
> A. I can water the dogs if the water hose is drug down to the dog lot for me so I don't have to pull on it. That's one joy I have.
> Q. Anything else?
> A. No sir. My family won't let me do anything because they've talked to my—my mother and brother were present at the surgery and Dr. Rainer told them that he's not to do anything—

(Transcript at p. 17).

8. With regard to his pain, plaintiff testified as follows:

> [G]etting out of bed in the morning is the first time it hits me. It takes me anywhere from 30 to 45 minutes to get up without calling for help. Going and doing my morning business, a bowel movement or anything like that, is totally—its an ordeal. Getting down is all right, but getting back up is definitely a problem. Going through the day, like I say, all I'm

(Transcript at p. 15). He testified that he also suffered chest pain because of his injury. (Transcript at pp. 19–20). Plaintiff testified that his injury was emotionally debilitating as well.[9] A vocational expert testified at plaintiff's workers' compensation trial. She identified the following jobs that plaintiff could perform based on the permanent restrictions imposed by plaintiff's doctor; ambulance dispatcher, answering service clerk, bowling alley desk clerk, and retail cashier clerk. (Transcript at pp. 41–42). Upon questioning from plaintiff's workers' compensation attorney, the vocational expert agreed that plaintiff would be unable to perform his old jobs because his previous jobs had been in the medium to heavy category and plaintiff's restrictions limited him to jobs in the light category. (Transcript at p. 44). The vocational expert did state that plaintiff had expressed an interest in electronics and had even discussed returning to school to obtain retraining. (Transcript at p. 40).

Sometime between the hearing on August 19, 1993 and February 8, 1994, Mr. Kirby relayed to Royann Hodges, defendant's human resources director, the testimony he had heard at plaintiff's workers' compensation trial. Mr. Kirby and Ms. Hodges determined that there were no jobs at defendant's plant that plaintiff could perform within the limitations described at the workers' compensation hearing. (Hodges Depo. at pp. 38–39; Kirby Depo. at p. 49).

On February 1, 1994, the circuit court judge entered an order finding that plaintiff sustained a 56% vocational disability as a result of his July 23, 1991 injury and awarded benefits accordingly. (*See* Judgment entered in CV 92–067, Circuit Court of Randolph County, Alabama) ("Judgment"). In addition, the judge noted that plaintiff had the permanent work restrictions of lifting no more than 25 pounds and no prolonged bending, stooping, or lifting. (Judgment at p. 2).

Plaintiff received his copy of the judgment on February 7, 1994. (Plaintiff's Depo. at p. 65). The next day, on February 8, 1994, 2½ years after his injury [and only 6 months after plaintiff under oath at his workers' compensation trial in the presence of Mr. Kirby (defendant's plant manager who, prior to February 8, 1994, communicated to Royann Hodges plaintiff's testimony) had testified in great detail in support of his compensation claim as to the total nature of his deteriorated condition], plaintiff returned to defendant's plant. (Plaintiff's Depo. at 59, 65).[10] The following facts are disputed, but viewed in a light most favorable to plaintiff

allowed to do is walk. Any extended periods of sitting like this or standing or anything becomes uncomfortable. The pain is constantly with me no matter what I do. Whether I'm standing, sitting, walking, there's no way I've been able to make the pain stop. It may not affect the same parts of the body. Like, when I'm walking, I feel it more up my back and down into the back of my legs. When I lay down, I feel it more in my feet and down the outsides of my legs. And, sitting like this right here right now, It feels like it's up between my shoulder blades. And, it is just constant, just pounding. I have headaches that I don't understand. I was not a person to have a headache. Everybody always told me I was too happy all the time. Something would happen and I would look for the silver lining in the cloud. I don't feel like that anymore because I don't know what's happening to me. Like I say, I'm 34 years old and I don't know what has happened with my life. Everything I've planned and dreamed on is gone. I can't do it anymore.
(Transcript at p. 16).

**9.** When asked whether his injury had caused him any other problems, plaintiff responded:

Emotionally, yeah. It's degrading to watch your family treat you like you're an invalid. It's shameful when you go to the store and your mother pushes you out of the way because what you're going after weighs more than 25 pounds. And, my mother is a little over 5 foot, and I'm almost 6'1" and I have to stand there and watch her pick up something. And people look at me funny. It's hard to explain, it's like a toothache, unless you've had one or you have been there, you don't know what it's like. It's everyday, constant.
(Transcript at p. 19).

**10.** Plaintiff claimed he was ready and able to return to work in June of 1992, approximately 2 months before his workers' compensation hearing, and even asked defendant about returning to work but was told by defendant that he could not return to work until the judge had issued a disability determination in his workers' compensation case. (Plaintiff's Depo. at pp. 51–55, 59–60, 99). Plaintiff also stated that from June of 1992 until February of 1994 he did not contact anyone at defendant's plant about returning to work, including his brother who was a supervisor at the plant and with whom plaintiff lived. (Plaintiff's Depo. at pp. 56, 96).

are as follows: Plaintiff testified that he went to defendant's plant at approximately 8 or 9 o'clock in the morning with the judgment in his workers' compensation case in hand and told Ms. Hodges that he was ready to return to his job as a machine operator. (Plaintiff's Depo. at pp. 64–65). Ms. Hodges proceeded to tell plaintiff that he should have received a separation notice informing him he had been terminated. Plaintiff denied receiving such notice, and Ms. Hodges went through plaintiff's personnel file. When her examination of plaintiff's personnel file revealed no separation notice, Ms. Hodges typed up the separation notice in front of plaintiff. Both Ms. Hodges and plaintiff signed the separation notice which stated that plaintiff was being terminated because he had a 25 pound lifting restriction and defendant did not have a job that required lifting less than 25 pounds. (Plaintiff's Depo. at pp. 65–69; Hodges Depo. at pp. 13, 20–21, Exhibit 2). After she handed him the separation notice, Ms. Hodges told plaintiff he should leave the premises. (Plaintiff's Depo. at p. 70).[11] It is undisputed that plaintiff never inquired about any other job or told defendant he was capable of performing any other job at defendant's plant other than machine operator. (Plaintiff's Depo. pp. 69–72, 93). Plaintiff did not make any reference to or discuss any improvements in his physical condition since his workers' compensation hearing or the possibility of accommodation to enable him to perform a job at defendant's plant. (Plaintiff's Depo. at pp. 69–72, 76–77; Hodges Depo. at p. 29).

Mr. Kirby, the plant manager testified that there was no job as of February 8, 1994 at defendant's plant that could accommodate an employee with a 25 pound lifting restriction and restrictions on bending and stooping.

(Kirby Depo. at pp. 36, 38). Mr. Kirby stated that if someone could not wash dishes because standing at the sink caused significant pain, that person would not be able to perform any job at defendant's plant. (Kirby Depo. at 49).

*The Americans With Disabilities Act:*

 The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (West 1993 Supp.). To qualify for relief under the ADA, a plaintiff must establish "(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *White v. York Intern. Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995). As with all discrimination cases, the plaintiff bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination because of his disability. *Id.* at 361.

1) *Disabled Person:*

 In 42 U.S.C. § 12102, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (West 1993 Supp.). Federal regulations define "major life activities" as "functions such as caring for

---

11. While the court views the evidence in a light most favorable to plaintiff, defendant's version of the events of February 8, 1994 is as follows: Ms. Hodges states that plaintiff came to defendant's plant on February 8, 1994 at around noon when Ms. Hodges was at the front desk to answer the phones. (Deposition of Royann Hodges at p. 25) ("Hodges Depo."). Ms. Hodges claims that plaintiff asked her to sign something so he could go into vocational rehabilitation. *Id.* Ms. Hodges signed the paper then told plaintiff that since she had not seen or heard from him since his accident in July of 1991 she wanted to put some-

thing in his personnel file showing that defendant knew of plaintiff's 25 pound lifting restriction and restrictions on bending and stooping. *Id.* Ms. Hodges typed out plaintiff's restrictions on a document titled "Separation Notice" because that was the only document in the front office. (Hodges Depo. at p. 25–26). Ms. Hodges then informed plaintiff that there were no jobs at that time at defendant's plant that plaintiff could perform with his restrictions. (Hodges Depo. at p. 26). Both Ms. Hodges and plaintiff signed the document. (Hodges Depo., Exhibit 2).

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Accepting as true plaintiff's own sworn testimony from his worker's compensation trial, plaintiff was clearly limited in one or more of his major life activities as of February 8, 1994. (*See generally* Transcript). However, in order to qualify for relief under the ADA, a plaintiff must show more than a disability; a plaintiff must show he is a "qualified individual with a disability."

2) *Qualified Individual With A Disability:*

■ A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (West 1993 Supp.). The term "essential functions" means the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n)(1). "Significantly, these provisions contain no reference to an individual's **future** ability to perform the essential functions of his position. To the contrary, they are formulated entirely in the present tense, framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995). The question therefore becomes whether plaintiff could perform the essential functions of his previous job or any job at defendant's plant as of February 8, 1994. It is irrelevant for purposes of this action whether plaintiff could perform the essential functions at some later date.[12]

■ Defendant has the right to determine the essential functions of jobs at its plant. *See* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential"); 29 C.F.R. § 1630.2(n)(3)(i) (an employer can determine which functions are essential). Defendant requires that the employees at its plant be able to lift more than 25 pounds, and frequently bend, climb, and lift. (Kirby Depo. at pp. 11–12; job descriptions contained in Plaintiff's Exhibit 5 in opposition to summary judgment). The permanent restrictions placed on plaintiff by his doctor include restrictions on tasks that defendant considers important to the performance of jobs at its plant. Prior to his injury, plaintiff was employed as a machine operator on the 280 machine. Plaintiff has admitted that he would be unable to perform his prior job as a machine operator on the 280 machine under any circumstances, and could not operate the other machines without accommodation. "[Plaintiff's] physical limitations directly relate to his qualifications for the position ... as [defendant] has defined it." *Bolton v. Scrivner, Inc.*, 836 F.Supp. 783, 788 (W.D.Okl.1993) (determination of worker's compensation court reinforces conclusion that plaintiff does not have the ability to perform required tasks of specific position).

■ The ADA does not require employers to modify the actual duties of a job in order to make an accommodation for individuals who are not physically capable of performing them. 42 U.S.C. § 12111(8) (West 1993 Supp.). As to other jobs in defendant's plant, the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment if the employee is unable to meet the demands of his present position. *Myers v. Hose*, 50 F.3d 278, 284 (10th Cir. 1995).[13] Even if defendant had such a duty,

---

**12.** In opposition to defendant's motion for summary judgment, plaintiff submitted the May 31, 1995 vocational assessment report of Lynn Carpenter, a rehabilitation specialist and the June 6, 1995 affidavit of his brother David Cheatwood who is a supervisor at defendant's plant each stating the jobs plaintiff would be able to perform at that time with accommodations. (Exhibits 2 and 5 in opposition to summary judgment). The report and the affidavit are irrelevant for purposes of the motion for summary judgment because the question is whether there were any

jobs at defendant's plant plaintiff could perform with or without accommodation as of **February 8, 1994,** not May or June of 1995.

**13.** *See also Cramer v. State of Florida,* 885 F.Supp. 1545, 1547–48 *4 (M.D.Fla.1995) ("[C]ounsel at the hearing [on defendant's motion to dismiss] argued that at the date they applied for workers' compensation benefits and were denied, the Plaintiffs have alleged that they were not capable of performing their job. The Defendants thus assert that the Plaintiffs could

plaintiff's sworn testimony from his August 19, 1993 workers' compensation trial shows that plaintiff was physically unable to perform the essential functions of any job at defendant's plant as of February 8, 1994, even with accommodation. Six months after testifying at his workers' compensation trial that he could not even perform basic household tasks, plaintiff went to defendant's plant to ask to return to his previous job as a machine operator. He did not give any indication that his condition had improved, and he did not tell defendant that he thought he was physically capable of performing other jobs at defendant's plant. Defendant, who was present at the workers' compensation trial and heard plaintiff's testimony, told plaintiff that there were no jobs at the plant that plaintiff could perform with his restrictions and limitations.

■ Faced with similar facts, other courts have held as a matter of law that a plaintiff is not a "qualified individual with a disability" because the plaintiff has represented that he or she was unable to perform the essential functions of their job in order to obtain disability benefits.[14] Having collected disability benefits based on these representations, the courts note that the plaintiff is thereafter estopped from asserting a claim for discrimination against the employer based on the representation that they could have performed the essential functions of their job. In these circumstances the courts have stated that a plaintiff "cannot speak out of both sides of [his] mouth with equal vigor and credibility before this court." *Reigel v. Kaiser Foundation Health Plan of N.C.*, 859 F.Supp. 963, 970 (E.D.N.C.1994) (Plaintiff not a "qualified individual with a disability" where she repeatedly certified to various insurance agencies for the purpose of obtaining disability benefits that she could not perform the essential functions of her job). Likewise, the instant plaintiff is bound by his prior testimony that he could not perform the essential functions of his prior job. He cannot now assert a claim for damages against defendant claiming that he could perform the essential functions of his job during the time in question.[15] Thus, plaintiff cannot make out a *prima facie* case under the ADA as he is not a "qualified individual with a disability."

■ Plaintiff maintains that defendant's failure to initiate colloquy in order to identify reasonable accommodations to allow him to perform other jobs at defendant's plant operates as a *per se* preclusion to summary judgment. (Plaintiff's Depo. at p. 100). Plaintiff's argument is misplaced. The burden is on the employee to inform the employer that an accommodation is needed and to request a specific accommodation. 29 C.F.R. § 1630.9; *see also Williams v. Casey*, 691 F.Supp. 760, 767 (S.D.N.Y.1988). Plaintiff admitted in his deposition testimony that on February 8, 1994 he only asked to return to his former job as a machine operator, which both he and his vocational expert admit he is unable to perform, even with accommodation. (Plaintiff's Depo. at pp. 69–72: Plaintiff's Exhibit 2

---

not have been otherwise qualified at the relevant date.... 'The very nature of the Workers' Compensation statute is designed to address those situations where an employee is unable to work or unable to work at his prior job and pay, because of a disability. Persons eligible for workers' compensation are not generally "otherwise qualified" for the jobs they held prior to their disability.' ")

**14.** *See Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 554–56 (D.Kan.1995) (Plaintiff not "qualified individual with a disability" under the ADA where plaintiff applied for and received company long-term disability benefits and social security disability benefits based on the representation that she could not perform the material duties of her job); *see also August v. Offices Unlimited, Inc.*, 981 F.2d 576, 581–84 (1st Cir. 1992) (Plaintiff's statements made to disability

insurers were binding admissions that he could not perform the essential duties of his job, thus, he was not a "qualified handicapped person" under Massachusetts disability law); *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 770–71 (8th Cir.1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988) (Plaintiff's Rehabilitation Act claim dismissed because plaintiff was not an "otherwise qualified handicapped individual" where she had certified to an insurance carrier that she was unable to work in order to obtain disability benefits).

**15.** Compare plaintiff's deposition testimony that he was ready and able to return to work in June of 1992 or at least by October of 1993 (Plaintiff's Depo. at pp. 98–99, 120) with plaintiff's sworn testimony at his August 19, 1993 workers' compensation trial.

in opposition to summary judgment). He also admits that he neither told defendant that he was able to or desired to perform any other jobs at the plant nor did he tell defendant that an accommodation was needed or requested. (Plaintiff's Depo. at pp. 69–72, 76–77).

■■■■ Moreover, as noted by the court in *White, supra*, the EEOC merely recommends that the employer and employee engage in colloquy regarding possible accommodations, but does not statutorily require such conversations. "It is important to note that the interactive process is triggered only if the employee is 'qualified.'... Thus the employer necessarily must make a threshold determination that the disabled employee may be accommodated, and is, therefore, qualified within the meaning of the ADA." *White*, 45 F.3d at 363. Plaintiff was not a "qualified individual with a disability," therefore, there was no need to discuss accommodations. As noted previously, only six months before he asked to return to his machine operator job, where it was necessary to lift up to 110 pounds up to 20 times a day, plaintiff testified under oath that he could not even lift a 5 pound bag of sugar, stand at the sink to wash dishes, or bend down to make his bed. Defendant's plant manager, Mr. Kirby, was present at the workers' compensation trial and heard plaintiff's testimony and communicated the limitations to defendant's human resources manager, Ms. Hodges. (Hodges Depo. at p. 20). Thus, it was not unreasonable for defendant to make the determination, only six months after the trial, that plaintiff was unable to perform any job at defendant's plant, even with accommodation.

■■■■ As evidence of discrimination, plaintiff also argues that defendant offered another employee light duty work with restrictions on lifting. However, "the fact that certain accommodations may have been offered by the [defendant] to some employees as a matter of good faith does not mean that

they must be extended to [plaintiff] as a matter of law." *Myers*, 50 F.3d at 284. Such a requirement would "discourage employers from treating disabled employees in a spirit that exceeds the mandates of federal law." *Id.* As noted above, given the testimony of plaintiff and the vocational expert at plaintiff's workers' compensation hearing, it was not unreasonable for defendant to determine that plaintiff was unable to perform any job at defendant's plant, even with accommodation.

Accordingly, defendant is entitled to a judgment in its favor with respect to plaintiff's claim for violation of the ADA.

*Retaliatory Discharge:*

■■■■ In Count Two of his complaint, plaintiff alleges that defendant terminated him in retaliation for filing a workers' compensation claim in violation of Alabama Code § 25–5–11.1 (1975). Section 25–5–11.1 provides:

> No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter....

Ala.Code § 25–5–11.1 (1975). A plaintiff establishes a *prima facie* case of retaliatory discharge under § 25–5–11.1 by proving,

> that he was 'terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff must prove that the reason was not true but a pretext for an otherwise impermissible termination.

*Twilley v. Daubert Coated Products, Inc.*, 536 So.2d 1364, 1369 (Ala.1988). Plaintiff claims that he was terminated on February 8, 1994 because he filed a workers' compensation claim against defendant. (Plaintiff's Depo. at pp. 67–69, 120).[16]

---

16. Defendant has argued in its brief that even though Ms. Hodges typed out plaintiff's 25 pound lifting restriction on a document titled "Separation Notice," plaintiff was not being terminated from his employment. (Hodges Depo. at pp. 26,

41). Ms. Hodges also stated that plaintiff was not a "layoff" but was just in limbo. (*Id; see also* Kirby Depo. at pp. 35–36). The distinction is immaterial; and for purposes of this motion, the court will assume that plaintiff was terminat-

■ Defendant has presented legitimate reasons, however, for plaintiff's termination. The undisputed evidence shows that 6 months prior to February 8, 1994, plaintiff testified that he could not lift a 5 pound bag of sugar without radiating pain, he could not lift any object over 5 pounds without losing grip of it, he could not bend over the sink to wash a glass without significant pain, he could not take out the trash or make his bed, he could not stand for more than 15 minutes, and he had to lie down for 15 to 20 minutes 5 to 6 times each day. Moreover, plaintiff's doctor gave him the permanent limitation of lifting no more than 25 pounds and no frequent bending, stooping or lifting. When he went to defendant's plant on February 8, 1994, plaintiff did not inform defendant that his physical condition had improved since his workers' compensation hearing. Defendant requires that employees at its plant be able to lift more than 25 pounds and frequently bend and lift. Based on his testimony at the workers' compensation trial, defendant determined that plaintiff was unable to perform these essential functions, and thus, defendant terminated plaintiff because he was unable to perform any job at defendant's plant.

■ The Alabama Supreme Court has discussed the burden on a plaintiff when an employer presents a legitimate reason for a termination:

> If the [employer] has supported a summary judgment motion with evidence of a legitimate reason for terminating the [employee], the [employee] must then refute that showing with his own prima facie case; of course, the [employee] has no burden to produce evidence before trial until the [employer] has made and properly supported a motion for summary judgment. If the [employer's] showing of a legitimate reason is conclusive enough to establish that 'there is no genuine [issue] as to [that] material fact and that the moving party is entitled to a judgment as a matter of law,' Rule 56(c), Ala.R.Civ.P., the [employee] would also have to produce evidence to refute that showing.

*Graham v. Shoals Distributing, Inc.*, 630 So.2d 417, 418 (Ala.1993). Such burden is

ed. *See also* Answer at ¶ 8 (plaintiff was termi-

consistent with *Fitzpatrick, supra.* To refute defendant's legitimate reason for termination, plaintiff points the court to the timing of plaintiff's termination. Plaintiff argues that once the workers' compensation court reached its decision, defendant immediately terminated plaintiff. However, it is undisputed that six months before requesting to return to work, plaintiff gave sworn testimony that he could not even perform simple housework, much less the essential job functions required of defendant's employees. When he asked for his machine operator's job back, plaintiff did not tell defendant that his physical condition had improved or that he was physically capable of performing other jobs at defendant's plant.

Alabama has not addressed the situation where an employer discharges an employee following a workers' compensation claim because the employee is physically incapable of performing the job duties. Other state courts have, however, addressed this issue. For example, in *Cardwell v. American Linen Supply,* 843 P.2d 596 (Wyo.1992), the plaintiff was terminated after filing a workers' compensation claim for being physically unable to perform her job duties. As in the instant case, she relied upon the juxtaposition of the date she filed her workers' compensation claim and the date she was terminated as evidence of retaliatory conduct. The court held that the plaintiff had not met her burden because:

> [t]here is a distinction between a termination for the exercise by the worker of his rights under the worker's compensation law and a termination for inability to do the work, even if such inability is caused by an accident requiring the exercise of worker's compensation rights. The disability and partial disability benefits of the worker's compensation law are in recognition of this distinction.

*Id.* at 599. The court affirmed the lower court's grant of summary judgment in favor of the employer. As in *Cardwell,* the instant plaintiff was physically unable to perform the jobs at defendant's plant on the (assumed) date of termination. Such termination date,

nated).

therefore, has little relevance on the issue of retaliation. In fact, the date of plaintiff's termination if anything indicated lack of retaliatory intent as defendant waited approximately 2 years after plaintiff filed a worker's compensation claim to terminate plaintiff's employment.

Defendant is, therefore, also entitled to judgment in its favor with respect to plaintiff's claim for violation of Alabama Code § 25–5–11.1.

A separate order in accordance with this memorandum opinion will be entered.

### FINAL ORDER GRANTING SUMMARY JUDGMENT

In accordance with the memorandum of opinion this day entered, it is ORDERED, ADJUDGED and DECREED that the motion for summary judgment filed by defendant Roanoke Industries is GRANTED and judgment in favor of said defendant is hereby ENTERED. Costs are taxed against the plaintiff.