**Lawrence L. PEDIGO, Plaintiff,**

v.

**P.A.M. TRANSPORT, INC., Defendant.**

**Civ. A. No. 93–5185.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Dec. 1, 1994.

Nancy Hamm, Hamm, Gibson & Westphal, Fort Smith, AR, for plaintiff.

Kenneth Hixson, Tontitown, AR, for defendant.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff, Lawrence L. Pedigo, was employed by defendant, P.A.M. Transport, Inc. (PAM), from September 22, 1981, until October 16, 1992. He claims that on that date his employment was terminated in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and in violation of Arkansas Public Policy as announced in cases such as *Wal–Mart Stores, Inc. v. Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991).[1]

The evidence at the trial indicated that from the time he was hired in 1981 until July 15, 1991, he was an over the road truck driver. From July 15, 1991, to January 7, 1992, he worked in the office as "driver liaison." It appears that position terminated by mutual agreement because his supervisors believed that he was not adequately performing that job. When that job terminated, he became, once again, an over the road truck driver, and drove for PAM until late May of 1992 when he suffered a heart attack. In June he underwent a procedure known as angioplasty and was on medical leave until his termination on October 16, 1992.

---

1. Ark.Code Ann. § 11–9–107 (Supp.1993) has now been amended to specifically annul the *Baysinger* case. The amendments however, are only applicable to injuries occurring after July 1, 1993.

After evidence was concluded, the court submitted the case to the jury on six interrogatories. In answering Interrogatories No. 1 and 2, the jury found that "the defendant intentionally discriminated against the plaintiff in violation of the provisions of the Americans with Disabilities Act" but that "defendant would have made the same decision based on legitimate non-discriminatory reasons." The jury answered "no" to Interrogatory No. 3, which asked "would [the employer] have fired the plaintiff or would have refused to place the plaintiff in a different employment position had it known of the alleged misconduct that occurred while he was driver liaison?" The jury also found that the defendant had not been terminated in violation of the public policy of the State of Arkansas.

The jury awarded plaintiff compensatory damages in the amount of $62,513.69, but specifically declined to award punitive damages. Because of its answers to other interrogatories, the jury, as instructed by the court, did not answer interrogatories having to do with lost wages, past or future.

At the close of the plaintiff's case and at the close of all of the evidence, defendant moved for judgment as a matter of law. These motions were denied, but the court indicated that it would carefully review the issues raised by those motions in the event of a jury verdict. The court entered the judgment on the jury verdict. Now before the court is defendant's Rule 50 motion in which it contends "that the evidence was insufficient as a matter of law." Fed.R.Civ.P. 50.

Since defendant's primary contention is that the evidence was insufficient to support the verdict of the jury, it is necessary to first determined the criteria by which the court is required or allowed to face that issue. Of course, prior to 1991 amendments made to the Federal Rules of Civil Procedure, a Rule 50 motion was a motion for directed verdict or motion for judgment notwithstanding the verdict. The 1991 amendments merely changed the name of these motions, but the standard for application of this rule remains the same.

As stated in 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 at 599 (1971): "The standard for granting judgment notwithstanding the verdict is precisely the same as the standard for directing a verdict." *Id.* (footnote omitted).

Thus, the test that this court must follow in ruling on the motion for judgment as a matter of law is well-stated in Wright and Miller § 2524 as follows:

> The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of the witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

*Id.* at 543–45 (footnotes omitted).

The Court of Appeals for the Second Circuit, in *Simblest v. Maynard,* 427 F.2d 1 (2d Cir.1970), stated the test that is to be applied in words that have been oft repeated:

> Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

*Id.* at 4.

The Court of Appeals for this circuit, in *Jeanes v. Milner,* 428 F.2d 598 (8th Cir.1970) advised trial courts that a judgment notwithstanding the verdict should be sparingly granted because to do so deprives the parties of their right to a jury trial.

When the criteria required by those cases is utilized, the court concludes there is clearly no basis for overturning the jury verdict because of insufficiency of the evidence. The court concludes that the jury heard sufficient evidence which, if believed, supports its verdict so there is no basis to grant the motion on that ground. However, there are at least

two legal issues raised by defendant's motion which deserve discussion.

First, plaintiff contends, peripherally at least, that the defendant was not a "qualified person with a disability." [2] Second, it is defendant's position that the jury's answer to Interrogatory No. 2 precludes a finding of liability, citing *Stacks v. Southwestern Bell Yellow Pages*, 996 F.2d 200 (8th Cir.1993) and *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444 (8th Cir.1993).

### I. Is Plaintiff a "Qualified Individual With a Disability"?

At the close of all of the evidence in this case the court advised counsel that it had a great deal of concern about this case and about whether the ADA, when properly interpreted, gave the plaintiff a cause of action. The court advised that the ADA as it was being interpreted had the potential of being the greatest generator of litigation ever, and that the court doubted whether Congress, in its wildest dreams or wildest nightmares, intended to turn every garden variety worker's compensation claim into a federal case.[3]

At the time that the court made the statements referred to above, it fully expected that it would be able to grant a judgment as a matter of law on the grounds that the plaintiff was not a "qualified individual with a disability" as that term is used and defined in the Act. The court's reasoning at that point was that, in order to be such an individual, the employee must have been an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Since the evidence in this case indicated that, unquestionably, the defendant could never again perform the essential functions of the truck driving job because of Department of Transportation (D.O.T.) regulations which would not allow him to remain, or his employer to allow him to work as an over the road truck driver, he could not ever again be an individual qualified for the truck driving job, and no accommodation, reasonable or otherwise, would ever change that.

The court recognized at that time that one of the "reasonable accommodations" listed which an employer may be required to provide is "reassignment to a vacant position," but the court found it difficult to believe that Congress intended to require an employer, in a case such as this one, to find an employee a new job or assign him to a job that he can do as part of the "reasonable accommodation" where the new job has no relationship to and is in no way connected to the job for which he became disabled. In those circumstances, the "accommodation" did not make it possible for him to do his job, it provided him with a new and completely different one.

The court still finds it difficult to believe that Congress really intended to cover employees such as the plaintiff in this case and has a firm conviction that the Act, although having laudatory purposes, because of its ambiguities and intended or unintended broadness of coverage, has the potential of turning federal courts into worker's compensation commissions, deterring such courts from competently and expeditiously handling important, traditionally federal controversies.

---

**2.** Actually, defendant contends that there was "insufficient evidence that the plaintiff was a 'qualified person with a disability.'"

**3.** Since making that statement, the court has learned that many have similar concerns: *See* for example Leslie Kaufman–Rosen with Karen Springen, *Who are the Disabled?*, NEWSWEEK, November 7, 1994, at 80. That article quotes statistics that are claimed to show that, rather than being used to protect the "handicapped," a "full 85 per cent of the discrimination claims under review have been brought by people already in the workplace. Half allege they have been wrongfully discharged. The most commonly cited disabilities are back pain and ailments like carpal tunnel syndrome and depression, which together account for 40 per cent of the

cases. By contrast, the blind and the deaf have filed only 6 per cent of all the actions to date." *Id.*

Since November of 1994 when lawyers in this small, mostly rural district, seemed to discover the possibilities of the ADA, 25 cases have been filed (3% of total filings) and 12 of those are in the Fayetteville Division (7% of the Fayetteville Division filings). In this case, the plaintiff first pursued and lost a worker's compensation claim and, in another case recently settled in this court, the plaintiff was pursuing, simultaneously, a worker's compensation claim and an ADA lawsuit seeking compensation for "whiplash" type injuries he allegedly suffered when he slipped on a wet spot at work.

The court doubts that the ultimate result of this law will be to provide substantial assistance to persons for whom it was obviously intended, and that one of the primary beneficiaries of it will be trial lawyers who will ingeniously manipulate such ambiguities to consistently broaden its coverage so that federal courts may become mired in employment injury cases, becoming little more than glorified worker's compensation referees.

Be that as it may, after considerable research, the court has concluded that it cannot, consistent with the statute, relevant case law, and intellectual honesty, grant the motion for a judgment as a matter of law in this particular case. That is true because the court believes that Congress, whether individual members realized it or not, by enacting the ADA, covered situations such as the one in this case. After the court has come to that realization, it may not, under our system, substitute its judgment about what is "good" or "right" for that of the legislative body elected to make that determination.

This is, of course, not this country's first experience with attempting to legislate to aid handicapped individuals or individuals with a disability. Federal employers and certain others who had their functions funded by federal monies were covered by the Rehabilitation Act of 1973, Pub.L. No. 93–112, §§ 500–504, 87 Stat. 390, 390–94 (codified as amended at 29 U.S.C. §§ 790–794c (1988).

In a note by Renee L. Cyr, *The Americans with Disabilities Act: Implications for Job Reassignment and the Treatment of Hypersusceptible Employees*, 57 Brook.L.Rev. 1237 (1992), the author discusses in some detail the history of and the actual implementation of the Rehabilitation Act. As that article points out, the legislation did not contain "reasonable accommodation" language nor language which indicate a requirement that an employer consider reassignment to another position when an employee became disabled in the position that he or she held.

As that article points out, for a considerable period after the Rehabilitation Act was passed, the various governmental agencies with duty to enforce it made and applied inconsistent rules and regulations. As the article indicates, at p. 1248:

After several years of conflict, federal administrative agencies finally resolved their differences in interpreting the Rehabilitation Act in 1986, deciding that an employer must reassign an employee with a disability to a vacant position if other forms of accommodation have failed. Courts, however, have continued to hold that an employer does not have a duty to reassign under the Rehabilitation Act.

(footnotes omitted).

The cases cited in the article and other cases found by the court indicate that the author's statement that federal courts had usually decided the "reassignment issue" diametrically opposite to the determinations made by the administrative agencies is well supported.

It is reasonable to assume that Congress, or at least the persons or groups that drafted the legislation for Congress, must have known of this conflict in respect to whether the employer, under the Rehabilitation Act, had a duty to reassign a disabled worker who could no longer do the job that he was hired to do to a vacant position that he could perform. In fact, much of the language now contained in the ADA appears to have been adopted from regulations promulgated in respect to the Rehabilitation Act. 29 C.F.R. § 1613.702(f) (1994) defines a "qualified handicapped individual" as "a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question....," language amazingly similar to that used in the ADA. Thus, an excellent argument can be made that Congress must have intended by the ADA to require employers to consider, as one of the employers reasonable accommodation duties imposed by the act, reassignment of the disabled employee to a job which he or she could perform. In other words, it appears that legislative history indicates that Congress intended to come down on the side of the administrative agencies which generally required the employer to consider reassignment, rather than on the side of the federal courts which had generally denied that the employer was obligated to do that.

Other legislative history supports that result. The House Education and Labor Report and the Senate Report accompanying the ADA, explicitly discussed job restructuring as a form of reasonable accommodation.[4]

The House Education and Labor Report said, at 62–63:

> The legislation specifies that discrimination includes the failure by a covered entity to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.... Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and employer from losing a valuable worker. Efforts should be made, however, to accommodate an employee in the position that he or she was hired to fill before reassignment is considered. The Committee also wishes to make clear the reassignment need only be to a vacant position— "bumping" another employee out of a position to create a vacancy is not required.[5]

The interpretation which the plaintiff urges is entirely supported by the EEOC's technical assistance manual,[6] created to provide assistance to employers and disabled persons in respect to what the EEOC believes is the practical application of the legal requirements of the statute and its regulations.

That manual provides at p. III–4:

> Reassignment is one type of accommodation that may be required under the ADA. If an employee whose job requires driving loses her sight, reassignment to a vacant position that does not require driving would be a reasonable accommodation, if the employee is qualified for that position with or without an accommodation.

That manual goes on to say at p. III–24:

> Reassignment may be an appropriate accommodation when an employee becomes disabled, when a disability becomes more severe, or when changes or technological developments in equipment affect the job performance of an employee with a disability. If there is no accommodation that will enable the person to perform the present job, or if it would be an undue hardship for the employer to provide such accommodation, reassignment should be considered....

■ For the reasons discussed above, the court is impelled and compelled to the conclusion that Congress, by what it wrought when it passed the ADA, gave employees such as the one in this case, under the circumstances of this case, a federal cause of action for an ordinary, on the job injury or disability. The fact that this court believes such a result to be unwise for numerous reasons is beside the point. Once having determined that a federal cause of action exists, the court must conclude that there was a jury question in respect to whether the employer discriminated against the employee in violation of the ADA by failing to consider reassignment to a vacant position (whether one was available is also a jury question) as required by the ADA. Reasonable minds could differ on this issue, so the motion for judgment as a matter of law must be denied. That this court views the result commanded by the statute to be unwise, is beside the point.

## II. *Effect of the "Mixed Motive" Finding by the Jury*

■ As already indicated, in answering Interrogatory No. 2, the jury found that the

---

4. H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2 at 62–63 (1990) and S.Rep. No. 116, 101st Cong., 1st Sess. 6 (1989) at 32.

5. The "bumping" language contained in the report appears to be "feel good" language which, in real life, has little effect. These are jury cases, and, as in this case, any lawyer worth his or her salt can make a jury question on whether other jobs were available or became available, projecting the employee's case into the wonderful world of lottery-like jury deliberation.

6. U.S. Equal Employment Opportunity Commission, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act, p. i (January, 1992).

defendant would have made the same decision based on legitimate non-discriminatory reasons. Defendant argues that this finding results in the plaintiff being precluded from receiving any relief in this case. In making that contention, the defendant apparently failed to recognize that the Civil Rights Act of 1991 amended 42 U.S.C. § 2000e–2 for the specific purpose of overruling the Supreme Court decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) which held that, where the employer shows that it would have made the same decision based upon legitimate non-discriminatory reasons, no liability will attach.[7]

The 1991 amendments appear to codify the principle, recognized in several courts before the 1991 amendments, that evidence of a lawful basis for an employer's discriminatory conduct is relevant only to the determination of appropriate relief for unlawful discrimination, not to the existence of liability. The Act, with respect to Title VII mixed motive cases, establishes that an employer may no longer escape liability entirely. The amendments appear to reverse decisions, including *Price Waterhouse,* decided before the effective date of the amendment, that hold that an employer who acts with a mixture of discriminatory and non-discriminatory motives may avoid a finding of liability under Title VII. *See Mardell v. Harleysville Life Ins. Co.,* 31 F.3d 1221 (3d Cir.1994) (to the extent *Price Waterhouse* barred all liability when the employer can show it would have taken the same action even had it not had any illegitimate motives, the 1991 act overturned it.)

The amendments do not eliminate the "same decision test" but rather eliminate the complete defense component of that test. Under the amendments, if both proper and improper motivations exist for the employment decision, the court must find a violation of the act. 42 U.S.C. § 2000e–5(g)(2)(B). *See also* 42 U.S.C. § 1981a(b)(3). However, the remedies are limited as set forth in the act. *Id.*

In view of the above, the court is convinced that the jury determination in this respect must be affirmed because the nature of the interrogatories which the court submitted to the jury required and allowed the jury to grant only the remedies permitted by the relevant statutes. The instructions contained with the interrogatories did not allow the jury to award damages not permitted by law since the jury found that this was a mixed motives case. The court's judgment carrying into effect the jury verdict specifically found that the plaintiff was not entitled to relief precluded by the jury's mixed motive finding.

For these reasons, the motion for judgment as a matter of law must also be denied in respect to this issue.

A separate order will be entered herein in accordance with the findings made in this memorandum opinion.

---

7. The ADA incorporates the procedural requirements of Title VII as well as the remedy limitations. 42 U.S.C. § 12117(a).