**Thomas E. FUSSELL, Plaintiff,**

v.

**GEORGIA PORTS AUTHORITY, Defendant.**

Civ. A. No. 494–318.

United States District Court, S.D. Georgia, Savannah Division.

Sept. 27, 1995.

Michael L. Edwards, Savannah, GA, for plaintiff.

Thomas J. Mahoney, Jr., Ranitz, Mahoney, Forbes & Coolidge, Savannah, GA, W. Christopher Arbery, G. Paris Sykes, Kilpatrick & Cody, Atlanta, GA, for defendant.

### *ORDER*

EDENFIELD, Chief Judge.

In this American With Disabilities Act (ADA) suit against the Georgia Ports Authority ("GPA"), plaintiff Thomas E. Fussell contends that the GPA violated the ADA by discharging him for failing a firearms proficiency test, a failure caused by his "benign essential tremor" disability. Moving for summary judgment, the GPA denies discriminating against him. Fussell opposes the motion, maintaining that an issue of fact remains.

### I. *BACKGROUND* [1]

The GPA maintains a deep water terminal in Savannah, Georgia, which serves as a point of entry for the United States. Statement ¶¶ 4, 7; Collins Aff. ¶ 7. The GPA operates its own police force to protect it. Statement ¶ 4. Much of that force is authorized to enforce the law and make arrests on GPA property. Statement ¶ 5; O.C.G.A. § 52–2–10. Occasionally it assists the U.S. Customs Department in gate searches and detaining criminal suspects. Collins Aff. ¶ 7.

Plaintiff Fussell commenced employment with the GPA as a GPA police officer on August 6, 1979. Statement ¶ 1. Promoted from officer to investigator in 1981, he later became sergeant before shifting from hourly to salaried status in 1992. Statement ¶ 2. On May 24, 1993, Fussell failed to pass part of a GPA-mandated, semi-annual "firearm qualification test," Statement ¶ 18, a test that he had passed in the past. Fussell Dep. at 22. There is no disagreement that the firearm test, which is given over two days, is uniformly applied and administered to measure individual skills and abilities with a gun. All officers are tested under the same conditions. Statement ¶¶ 9–15.

Plaintiff did not inform the GPA of any medical, physical or mental problems before or during the test. Statement ¶ 18.[2] Despite being provided instruction, as well as permission to switch from a .38 caliber to a .9 mm pistol, Fussell nevertheless again failed the second part of the test two days later. Statement ¶ 19–20. Fussell did not practice between tests. Statement ¶ 19. Nor did he complain of any impediment, or request that any accommodation be made for the second day of testing either. Statement ¶ 20. Plaintiff claims that he requested no accommodation because he was not informed that the GPA would make any accommodation if it were asked. Fussell Aff. ¶ 13.

Following Fussell's failure at the target range, he contacted the GPA's human resource manager to seek another position. Statement ¶ 22; Fussell Dep. at 31. In the meantime, the GPA placed plaintiff on sick leave so he could be evaluated by a specialist. Statement ¶ 22; Fussell Dep. at 35. Fussell's physician subsequently informed the GPA that he could perform only sedentary work. Statement ¶ 22. Fussell then took vacation leave. Fussell Dep. at 38. He later returned to the GPA Human Resources Department in search of alternative employment. Statement ¶ 23; Fussell Dep. at 39–40. At that time he completed a questionnaire detailing his experience and qualifications. *Id.*

---

1. These facts are derived principally from the GPA's July 24, 1995 Statement Of Undisputed Material Facts (Statement) to the extent that plaintiff's August 14, 1995 response agrees with or fails to negate same. Local Rule 56.1.

2. Mr. Fussell does not dispute this except to point to deposition testimony suggesting prior knowledge by GPA personnel. GPA's police chief acknowledged that, for a number of years, Fussell had exhibited "a shaking condition," but he did not associate it with Fussell's claimed disability, J. Collins Dep. at 45, evidently because plaintiff had qualified on the target range in the past despite his condition.

Two weeks later, Fussell, for the first time, informed the GPA that he believed he had been unable to pass the firearm qualification test because of "certain tremors." Statement ¶ 24; Fussell Dep. at 44. He claimed that doctor-prescribed medication brought his tremors under control, then requested another firearms proficiency test. *Id.*

The GPA responded by requesting medical documentation of his condition; Fussell was to return a questionnaire to be completed by his physician. Statement ¶ 25. Plaintiff returned the questionnaire completed but unsigned and missed the GPA's response deadline in the process. Statement ¶ 26. The GPA then informed Fussell by letter that it had not received the information it had requested and that his paid benefits with the GPA had expired. In addition, the GPA considered his employment terminated but would discuss with him any future GPA employment he might seek. Statement ¶ 27.

Fussell appealed his termination within the GPA. Statement ¶ 28. In response, the GPA offered plaintiff another opportunity to pass the firearm-proficiency test, but requested medical documentation concerning his condition. Statement ¶ 28. Subsequently, Fussell's physician sent the GPA a letter stating that Fussell was being treated for "benign essential tremor." Statement ¶ 29. However, the letter also stated that Fussell should be able to take the test and that present treatment, which included medication, should not interfere with his employment. Statement ¶ 29; Strickland Dep. at 43–45, 51–52.

Plaintiff returned to the firing range to take the GPA's test and requested no modification other than permission to switch from a .38 caliber revolver to a .9 mm pistol. Statement ¶ 30. The GPA accommodated him, *id.,* but plaintiff again failed the test. Statement ¶ 31. The GPA offered, but Fussell again failed to exploit, an opportunity to practice between testing days. *Id.* Fussell also failed the second day of testing. Statement ¶ 32. Once again, he made no accommodation request. *Id.;* Fussell Dep. at 66–67.

The GPA then encouraged plaintiff to apply for any future job openings that interested him and to contact its job-opening hotline.

Statement ¶ 33. Nevertheless, the GPA's Human Resources department never heard from Mr. Fussell. *Id.;* Fussell Dep. at 69. Instead, he filed a charge of discrimination with the EEOC a month later and initiated this lawsuit following his receipt of the EEOC's right-to-sue notice. Statement ¶ 34. In addition, Fussell applied for and received Social Security benefits, qualifying for 100% disability. Statement ¶ 35. He has been receiving 100% disability benefits since. Fussell Aff. ¶ 11.

Finally, Fussell maintains that the GPA failed to contact him about a "hazardous materials handler" position that opened up within ninety days of his discharge. Fussell Aff. ¶ 10. However, he provides no evidence that he informed the GPA of his interest in that position.

## II. ANALYSIS

### A. ADA—General Standards

■ The ADA was enacted to discourage discrimination against disabled persons in the work place, *Milton v. Bob Maddox Chrysler Plymouth, Inc.,* 868 F.Supp. 320, 324 (S.D.Ga.1994), the history of which is detailed in *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 387–90 (N.D.Iowa 1995). The ADA

> prohibits employers from discriminating against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112. A "qualified individual with a disability" is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the position that the individual holds or desires.

*Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1099 (S.D.Ga.1995). The terms employed in the above excerpt require definition within the context of what constitutes a prima facie case.

### B. ADA—Disability

■ Establishing that one is disabled is the cornerstone to an ADA plaintiff's prima facie case. Disability means that the individual

(a) has a physical or mental *impairment* that *substantially limits* one or more of the major life activities of such individual; [or]

(b) a record of such impairment; [or]

(c) [is] being regarded by his employer as having such impairment.

42 U.S.C. § 12102(2) (emphasis added); *Milton v. Scrivner,* 53 F.3d 1118, 1123 (10th Cir.1995). These "disability" criteria were explored in *Wooten v. Farmland Foods,* 58 F.3d 382, 385–86 (8th Cir.1995); *Haysman,* 893 F.Supp. at 1099–1100; *Rhodes v. Bob Florence Contractor, Inc.,* 890 F.Supp. 960, 962–63 (D.Kan.1995); and *Ricks v. Xerox Corp.,* 877 F.Supp. 1468, 1474–76 (D.Kan. 1995). Disability determinations often turn on whether the impairment substantially limits a "major life activity" (*e.g.,* "an individual whose legs are paralyzed," 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 402 (1995)), in which case an impairment may be shown.

In contrast, if the individual is not "substantially limited with respect to ... a major *life* activity, the individual's ability to perform the major life activity of *working* should be considered." 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403 (1995) (emphasis added). However, a substantial limitation in a major life activity typically obviates the need to inquire as to work activity. For example, "if an individual is blind, *i.e.,* substantially limited in the major activity of seeing, there is no need to determine whether the individual is also substantially limited in the major activity of working." 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403 (1995). But where the ADA plaintiff tries to show a substantial limitation in the major life activity of *working,* three additional factors may be considered, including the geographical area to which the individual has reasonable access and a "similar jobs" comparison analysis as set forth in 29 C.F.R. § 1630(j)(3)(ii) (1995). *Rhodes,* 890 F.Supp. at 963.

■ In all cases, an impairment, real or perceived, must be substantially limiting, which means "significant." *Wooten,* 58 F.3d at 385. A significant impairment is one that is viewed as foreclosing generally the type of employment involved, not just a narrow range of job tasks. *See Hutchinson,* 883 F.Supp. at 390–91. In fact,

the term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable skills and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*

29 C.F.R. § 1630.2(j)(3) (1995) (emphasis added). The C.F.R. ADA Appendix provides further elaboration:

For example, an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working. Nor would a professional baseball pitcher who develops a bad elbow and can no longer throw a baseball be considered substantially limited in the major life activity of working.

29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403 (1995).

In both the pilot and pitcher examples, "the individuals are not substantially limited in the ability to perform any other major life activity and, with regard to the major life activity of working, are only unable to perform either a particular specialized job or a narrow range of jobs." *Id.*

### C. ADA—Essential Job Functions

■ In addition to the initial showing of "disability," the ADA plaintiff's prima facie case must also establish the plaintiff as a *"qualified* individual with a disability." 42 U.S.C. § 12111(8) (emphasis added). An ADA claimant is "qualified" if, with or without the employer's reasonable accommodation, he can perform the "essential functions" of the job. The "essential functions" are the "fundamental job duties of the position in question." *Haysman,* 893 F.Supp. at 1101.

Some ADA claimants argue whether the essential function claimed by the employer truly is "essential," as opposed to dispensable, or even pretextual (*i.e.,* employed more

to discriminate than to advance a legitimate job requirement, *see* 42 U.S.C. § 12112(b)(6)). In response to a plaintiff's showing in that regard, the employer can point to

> [e]vidence of whether a particular function is essential[, which] includes, but is not limited to: (1) the employer's judgment as to what is essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, (4) the consequences of not requiring the individual to perform the function, (5) the terms of a collective bargaining agreement, (6) the work experience of past incumbents in the job, and (7) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3)(i–vii).

*Haysman,* 893 F.Supp. at 1101.

■ In that regard, "consideration shall be given to the employer's judgment as to what functions of a job are essential. . . ." 42 U.S.C. 12111(8); 29 C.F.R. § 1630.2(n)(3)(i) (1995); 29 C.F.R. Pt. 1630 App. § 1630.2(n) at 405–06 (1995); *Johnston v. Morrison, Inc.,* 849 F.Supp. 777, 778 (N.D.Ala.1994) How much consideration should be given is left undefined. This Court agrees, however, that "[t]he most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear." *Wilson v. AAA Plumbing Pottery Corp.,* 34 F.3d 1024, 1030 (11th Cir. 1994) (Edmonson, J., dissenting), *vacated for reh'g en banc,* 60 F.3d 744 (11th Cir.1995).

### D. Reasonable Accommodation

#### (1) Reasonable Accommodation— Timely Request

■ At this point in the ADA prima facie case, an ADA plaintiff must show that he is qualifiedly disabled, which means he can, with or without reasonable accommodation, perform an essential function of the job. He can argue that the function in question is not essential, in which case he can then proceed to establish the remainder of his prima facie case showing unlawful termination because of his disability. But if the ADA plaintiff fails to overcome the employer's showing that the job function in question is essential, then he must show that he can perform the essential job function with or without reasonable accommodation made for his disability.

■ Where the ADA plaintiff intends to show that he can perform the essential job function with reasonable accommodation, the initial evidentiary burden of production is placed upon him. The plaintiff must show that his employer can make a reasonable accommodation to enable the plaintiff's employment notwithstanding his disability. *Ricks,* 877 F.Supp. at 1476. Of course, "[b]efore an employer must make accommodation for the physical or mental limitation of an employee, the employer must know that such a limitation exists." *Miller v. National Cas. Co.,* 61 F.3d 627, 629 (8th Cir.1995); *Hutchinson,* 883 F.Supp. at 393–94 (collecting cases).

■ Hence, the ADA plaintiff must also show that the employer had knowledge of the limitation and the need to accommodate it before it failed to make a reasonable accommodation. That, by definition, puts the burden on the non-obviously disabled plaintiff to timely alert the employer to his claimed disability and thus afford the employer an opportunity to make a reasonable accommodation. *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528, 1538–39 (N.D.Ala.1995); *Mears v. Gulfstream Aerospace, Corp.,* 905 F.Supp. 1075, 1080 (S.D.Ga.1995) (" 'it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed' ") (quoting 29 C.F.R. Pt. 1630, App. § 1630.9 at 414 (1995)).

■ It follows that the ADA claimant, who is in the best position to know what accommodation is needed, must request a reasonable accommodation at the time the disability in question presents a problem on the job. *See Hutchinson,* 883 F.Supp. at 394 (" 'the ADA does not require clairvoyance' ") (*quoting Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995)); *Ferry v. Roosevelt Bank,* 883 F.Supp. 435, 440–41 (E.D.Mo.1995) (the ADA's legislative history indicates that, "while it is generally an employee's duty to request an accommo-

dation, an employer may ... initiate a discussion concerning the need for accommodation when an employee with a known disability is having problems with job performance.... [But 'i]n the absence of a request, it would be inappropriate to provide an accommodation'") (quoting H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess., 65 (1990)), U.S.Code Cong. & Admin.News 1990, 267, 347.

 In other words, it is simply too late to raise suggested accommodations two years later in a summary-judgment response brief. The essence of the ADA claim is discrimination in the work place, which means while the employee is *on* the job. Hence, the employee must show that he requested a reasonable accommodation while on the job (or that the adaptation constituting the suggested accommodation was reasonably apparent) but the employer simply refused to make that accommodation, thereby discriminating against the employee at the time. Without this requirement the employee could casually mention a claimed disability, say nothing, wait to be terminated, then think up new suggested accommodations years later while in the midst of ADA litigation. This would unfairly subject the employer to a "retro-discrimination" standard, where the employer "should have thought of" the accommodation at the time even if the employee did not.

### (2) Reasonable Accommodation— Burden Of Proof

The next step in the statutory scheme requires an allocation: whose burden is it to show what constitutes a reasonable accommodation? Much debate on this topic is captured in *Borkowski v. Valley Central School District,* 63 F.3d 131, 137–139 (2nd Cir.1995); *see also id.,* at 143–146 (concurrence), which is a Rehabilitation Act case but nevertheless appropriate to consider here since the ADA "imposes obligations equivalent to those under [the Act], *see* 29 U.S.C. § 794(d)". *Id.* at 137.

 Upon visitation of the split among the Circuits, this Court holds that, since the ADA plaintiff is in the best position to know his own limitations, the initial burden to show

what constitutes a reasonable accommodation is upon him. Further, that burden is twofold. The employee must (1) proffer to his employer ways in which he can be reasonably accommodated, *Borkowski,* 63 F.3d at 138 ("the plaintiff bears the burden of proving either that she can meet the requirements of the job without special assistance, or that an accommodation exists that permits her to perform the job's essential functions"); and (2) do it in a timely fashion.

As to the proffer requirement, the plaintiff bears only a burden of production. *Id.* at 139. It is not a heavy one, but the plaintiff must show the existence of a plausible accommodation, the costs of which do not clearly exceed its benefits. *Id.* The timeliness requirement, in contrast, remains with the plaintiff to the point of persuasion by a preponderance of the evidence.

 Once the plaintiff meets his initial burden of production on the first element of the reasonable accommodation showing, the risk of nonpersuasion shifts to the employer to present evidence of its inability to accommodate. *Borkowski,* 63 F.3d at 139. The timing factor likewise applies here. In other words, after-the-fact rationalizations in summary-judgment briefs, or so-called "after-acquired evidence," would not appear to have any application in this context. *See Schmidt v. Safeway, Inc.,* 864 F.Supp. 991, 994–995 (D.Or.1994); *but cf., Wallace v. Dunn Const. Co., Inc.,* 62 F.3d 374, 378–79 (11th Cir.1995) (en banc) (after-acquired evidence rule announced in *McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), applies to Title VII and Equal Pay Act cases).

 Rather, the employer must show either that (1) plaintiff failed to timely call the employer's attention to the need to make an accommodation, and such need was not otherwise reasonably apparent; or (2) the employer tried to accommodate or meaningfully explored the option but in good faith concluded it was unable, absent undue hardship, to accommodate. *See* 42 U.S.C. § 12111(10) (defining undue hardship). As to the second element, the employer in effect must perform a "cost-benefit analysis," *Borkowski,* 63 F.3d

at 139, which is a more refined analysis than that used by the employee in meeting his initial burden of production. *Id.* at 139–140. Where the employer makes this showing, the employee, upon whom the burden of persuasion ultimately remains, *id.*, at 140–142 ("[i]n either case, the burden of persuasion on this issue, the existence of an effective accommodation, remains with the plaintiff"), must then rebut the employer's showing. *See Ricks,* 877 F.Supp. at 1476.

### (3) What *Is* A Reasonable Accommodation?

 Resolving the "undue hardship" or "inability to accommodate" element is problematic. As the *Borkowski* court noted, "reasonable" is a relational term. *Id.,* 63 F.3d at 138. "An accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." *Id.,* at 138. Under 42 U.S.C. § 12111(9)(B), reasonable accommodation *"may* include ... job restructuring ... [which can include] reassignment to a vacant position...." (Emphasis added); *Pedigo v. P.A.M. Transport, Inc.,* 891 F.Supp. 482, 486–87 (W.D.Ark.1994), *vacated and remanded on other grounds,* 60 F.3d 1300, 1303–04 (8th Cir.1995); *Haysman,* 893 F.Supp. at 1102–1103. Not making reasonable accommodations for the known physical or mental limitations of an otherwise qualified, disabled employee (*e.g.,* making changes to work rules, facilities, and working conditions, where such changes do not unduly burden the employer), can constitute discrimination. *Rhodes,* 890 F.Supp. at 963.

 On the other hand, "[t]he law is clear that *reallocation* of job duties constitutes a change in the essential functions of [the employee's] job and [therefore] is not required under the ADA." *Otis v. Canadian Valley–Reeves Meat Co.,* 884 F.Supp. 446, 449 (W.D.Okl.1994) (emphasis added); *Scrivner, Inc.,* 53 F.3d at 1123–24 (altered or reduced production standards or designation of lighter workload was not a "reasonable accommodation" for employees who were unable, due to their alleged disabilities, to meet employer's new production standards; employer was not required to reallocate job duties, altering essential function of job, where such accommodation would have required other workers to work harder or longer hours, etc.); *Eckles v. Consolidated Rail Corp.,* 890 F.Supp. 1391, 1399 (S.D.Ind.1995) ("Nor is an employer required to accommodate a disabled employee in exactly the way he or she requests"); *Champ v. Baltimore County,* 884 F.Supp. 991, 999 (D.Md.1995) ("An accommodation is unreasonable if it requires elimination of an essential duty"); *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1583 (N.D.Ga.1994).

 Nor, for that matter, does the ADA require "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled." *Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995). That is because the ADA "prohibits discrimination against qualified individuals, no more and no less." *Id.; Wooten,* 58 F.3d at 386 ("An employer is not required to make accommodations that would violate the rights of other employees"); *Eckles,* 890 F.Supp. at 1407–13 (other employees do not have to "bumped," nor does a bona fide seniority system have to be disrupted, in order to accommodate an ADA plaintiff); *Haysman,* 893 F.Supp. at 1103–1104; *Ricks,* 877 F.Supp. at 1477 (company was not required to promote employee, nor provide him with a "helper" under reasonable accommodation standard); 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) at 407 (1995) (an employer would not have to provide a blind security guard with an assistant to read identification cards, where security guard position required that ability; the assistant would be performing the job rather than assisting the disabled individual to perform the job).

### E. Replacement By Less Or Non–Disabled Employee

The parties in this case do not address what another court has included as part of an ADA plaintiff's prima facie case: replacement by the employer with a less or non-disabled employee. *See Hutchinson,* 883 F.Supp. at 394–95 (noting that the case law is unsettled as to what constitutes a prima facie

case, but including the requirement that an ADA plaintiff must show replacement by less or non-disabled person, or one whose disability is more easily accommodated, etc.); *Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 259 (N.D.Miss.1995) (noting case law split on this element); *cf., Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556–57 (11th Cir.1995) (replacement component of Title VII prima facie case, applying *McDonnell Douglas* standards); *Ferry*, 883 F.Supp. at 440 (*McDonnell Douglas* standards apply to ADA claims). This Court will set aside consideration of that issue in light of the holding reached below.

To summarize, an ADA plaintiff who has properly exhausted his EEOC remedies must prove all of the following: (1) he has a disability known to the employer; (2) he is, with or without reasonable accommodation, qualified to perform the essential functions of his job; and (3) an inference can be drawn that he was discriminated against (*e.g.*, terminated) because of his disability. *Scrivner*, 53 F.3d at 1123; *Tyndall v. National Educ. Centers*, 31 F.3d 209, 212–13 (4th Cir.1994); *Otis*, 884 F.Supp. at 448–49.

If the plaintiff succeeds in making his prima facie case, the burden shifts to the employer to rebut the initial showing. If the employer meets its burden, the plaintiff has a final opportunity to make his case. "As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability." *Rhodes*, 890 F.Supp. at 964; *see also Walker*, 53 F.3d at 1557 (while the ultimate burden in Title VII cases must be shown by a preponderance of evidence, under *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), the sole inquiry, once the defendant has met its burden of production, is whether the plaintiff successfully carried his burden of persuading the trier of fact that the defendant intentionally discriminated based upon a prohibited factor). Therefore, even after the ADA plaintiff

establishes a prima facie case, the defendant employer may provide a legitimate, non-discriminatory reason for the plaintiff's discharge. In response "the plaintiff must come forward with evidence that the defendant's legitimate reason is merely a pretext for discrimination." *Oswalt*, 889 F.Supp. at 259.

### F. Analytical Shortcut

A defendant need not thread through the entire burden-shifting framework illuminated above in order to prevail in an ADA case. In many cases the disabled plaintiff, with or without his employer's reasonable accommodation, simply can *not* perform the essential function of the position he holds or desires. In that case he cannot show that he was "qualified" under the ADA. An employer can shorten the litigation by assuming *arguendo* the existence of a disability and then showing that the employee simply cannot perform the job even with a reasonable accommodation, or that no reasonable accommodation can be made.

In *Ricks*, for example, the plaintiff did not dispute that, because of his disability, he could not perform the essential functions of his previous position. Furthermore, he failed to overcome Xerox's showing that it could not reasonably accommodate him by finding him another job consistent with the restrictions placed upon him or which he would accept. 877 F.Supp. at 1476–77. Nor did Ricks proffer any evidence that other positions were available which he could perform, and Xerox was not required to promote him or provide him with a "helper." *Id.; see also Larkins*, 858 F.Supp. at 1582.

### G. Plaintiff Fussell's ADA Claims
#### (1) Plaintiff Is Not "Disabled"

Turning to the instant case, this Court preliminarily concludes from the evidence presented that being able to shoot straight is a bona fide essential function of Fussell's employment as a port authority police officer.[3] *See Champ*, 884 F.Supp. at 998;

---

**3.** Among other things, the firearm proficiency requirement has been long-standing and forms part of the GPA Police Department Rules and

Regulations. Collins Dep. Exh. D at 65; Collins Aff. ¶¶ 9–14. GPA job announcements place applicants on notice of this requirement. Strick-

*Ethridge v. State Of Ala.*, 860 F.Supp. 808, 818–819 (M.D.Ala.1994). In addition, there is no dispute that Fussell can perform all but one requirement of the GPA policeman's role: proficiently firing a sidearm. In other words, he does not dispute that he cannot pass the firearms-proficiency test.

 It is in that light that plaintiff has failed to make a prima facie case. Like the baseball pitcher or commercial airline pilot, 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403 (1995), Fussell is essentially unable to "perform [only] a single, particular job[, which] does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3) at pp. 391–92 (1995). He therefor has not shown that he is disabled in the major life activity of working.

Nor has plaintiff shown enough evidence to raise a jury issue over whether he endures a major life impairment disqualifying him from the general category of security guard employment. Put another way, Fussell has not shown that he could not perform as an *unarmed* security guard, which is analogous to the pilot and pitcher examples discussed above. Indeed, he has not shown that, after failing the second round of testing, he timely applied for, or otherwise requested, any other then-available GPA job. Conversely, there is every indication that the GPA timely invited plaintiff to apply for any other non-firearm based employment, but he failed to exploit same, choosing instead to resort to litigation and collect Social Security benefits.

The record therefore shows that plaintiff joins those "individuals[, who] are not substantially limited in the ability to perform

land Dep. at 75, Exh. C. *See* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the Job"). Plaintiff complains that the GPA raised the passing score by 10% from 1992 to 1993. However, there is no evidence showing that this constitutes a mere pretext, and this Court will respect the GPA's reasoned judgment that such was necessary to improve the quality of its force as a whole. Collins Aff. ¶¶ 9–14.

In that regard, the fact that GPA police guns are rarely unholstered does not undermine the

any other major life activity and, with regard to the major life activity of working, are only unable to perform either a particular specialized job or a narrow range of jobs." 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403 (1995). Hence, Fussell has failed to establish the cornerstone to his ADA case: that he is "disabled."

### (2) Reasonable Accommodation

Even if Fussell could be characterized as disabled, there is no evidence presenting a jury issue whether he could, with or without reasonable accommodation, perform the essential job function embodied in the GPA's firearms proficiency requirement (*i.e.*, shooting straight). Plaintiff has cited to no evidence showing a timely request for reasonable accommodation that GPA could have made. Fussell therefore establishes no prima facie ADA case on these grounds either.

 Even if Fussell showed that he timely requested reasonable accommodations, nevertheless he has failed to carry his burden of production, much less persuasion, as to how the GPA reasonably could have accommodated him. The GPA simply was not required to create a special, "unarmed police officer" position within the Savannah port complex, nor reallocate one of the fundamental duties of the armed police officer's job: firearms proficiency. Fussell does not dispute that he cannot pass the GPA's firearm proficiency test. Also, there is no evidence that the test was applied to him in a discriminatory fashion.

GPA's assertion, as reflected in its long-standing and written policy, that its Savannah port officers be ready to safely use their weapons to deter and interdict the criminal activity bound to arise at any major port of entry. *See* Collins Aff. pp. 2–3 & ¶ 4. Fussell's "contrary evidence" consists of little more than his own speculation-based opinion minimizing the dangers criminals present and the deterrent effect armed police provide. The same may be said for Fussell's "evidence" trying to minimize the importance of the firearms proficiency test. The GPA's evidence, including its police chief's affidavit testimony, amply satisfies the "business necessity" requirement of 42 U.S.C. § 12112(b)(6).

In his brief Fussell suggests other ways in which the GPA can modify its testing (water it down, the GPA contends) or otherwise accommodate him. But plaintiff is too late for the reasons set forth in Part II(D)(1) *supra.* Fussell further complains that the GPA should have "noticed" his condition and that it "failed" to educate him as to his right to request a reasonable accommodation contemporaneous to his failure on the firing range. But plaintiff points to nothing requiring the GPA to have affirmatively suggested ways to accommodate his condition prior to each firearm proficiency test. The evidence is undisputed that he did not complain beforehand that his disability required some sort of adaptation or special assistance to enable him to fire his gun proficiently.

■■■ Furthermore, the fact that some GPA employees may have noticed his tremors prior to the testing does not mean that the GPA, especially in this instance where the plaintiff had passed the test in the past despite his condition, was affirmatively obligated to legally counsel Fussell as to any "ADA right" to request reasonable accommodation beforehand. The work place is full of workers with visible limitations who nevertheless are able to adapt and perform their job without requesting, much less receiving, special accommodations or legal advice from their employer.

■■■ As mentioned above, before the employer can be charged with failing to reasonably accommodate the disabled worker, it must be shown to have been aware of a "significant" impairment, *Wooten,* 58 F.3d at 385, one that is "substantially limiting" to the extent that it forecloses generally the type of employment involved, not just a narrow range of job tasks. *See Hutchinson,* 883 F.Supp. at 390–91. Fussell has not made that showing here. The ADA, it must be remembered, is not an affirmative action policy. *Daugherty,* 56 F.3d at 700. It is up to the potential ADA claimant to assert his rights.

■■■ Even if Fussell had timely complained of his disability and requested an accommodation, he has failed to show how this could be done. A police force consists of members who must rely upon each other for back-up in life and death situations. A fellow officer's ability to draw his or her gun and accurately shoot it is a self-evident requirement in protecting fellow officers in a large variety of situations (*e.g.,* assisting an officer who encounters a group of armed criminals, or who is caught in a cross-fire, etc.). A GPA policeman who cannot shoot straight poses an unacceptable risk to others. Plaintiff has not shown how his deficiency, and the direct threat to the health of others that it represents, can be reasonably accommodated. His ADA claim also fails on these grounds. *See Champ,* 884 F.Supp. at 998 ("an individual is not otherwise qualified if he poses a direct threat to the health or safety of others because of his disability that reasonable accommodation cannot eliminate"); 42 U.S.C. § 12113(b). Nothing in the ADA, nor in the way the GPA runs its police force, where all but two administrative personnel members must be firearms proficient, Collins Aff. ¶ 9, requires the GPA to water down its testing requirements.

■■■ Finally, even assuming that, notwithstanding Fussell's passivity at the time, the GPA was required to encourage him to seek employment in completely different lines of GPA work, the record also shows that the GPA did precisely that, encouraging Fussell to apply for other positions, but he did not. Plaintiff therefore also is estopped from complaining that the GPA failed to consider reassignment to a vacant position as a means of accommodating him. To that end, plaintiff points to no legal authority requiring the GPA to contact him, post-termination, and offer him every job that opened up. Stated differently, if Fussell could not be bothered to stay in contact with the GPA's Human Resources Department and inquire about alternative forms of employment, then the GPA was entitled to do likewise. The ADA is not a job-insurance policy. *Rhodes,* 890 F.Supp. at 962. Hence, plaintiff's insistence that the GPA should have contacted him about a "hazardous materials handler" position that opened up within ninety days of his discharge, Fussell Aff. ¶ 10, affords him no grounds for relief.

## H. ADA—Estoppel

The *Ricks* court also addressed an issue that arises upon the ADA plaintiff's representation to a government or private agency that he is totally and permanently disabled, resulting in the receipt of permanent disability benefits. More specifically, that court took issue with Ricks' claim that he was "qualified" to perform the essential functions of his position when in fact he had previously claimed entitlement to long-term disability benefits and thus, by definition, was unable to "be employed in any substantial and gainful work either inside or outside of Xerox." *Ricks*, 877 F.Supp. at 1477. Mr. Ricks therefore was

> arguably estopped from now claiming he was in fact a qualified individual. *Cf., Garcia–Paz. v. Swift Textiles, Inc.,* 873 F.Supp. 547, 555–57 (D.Kan.1995) (Plaintiff, her counsel, and her physician consistently represented that she was entitled to long-term disability benefits because she could not perform the material duties of her job. Having collected benefits, based on the unambiguous, informed representations, plaintiff was held estopped from claiming in her lawsuit that she could perform the essential functions of her position).

*Ricks*, 877 F.Supp. at 1477 n. 9.

*McNemar v. The Disney Stores, Inc.,* 1995 WL 390051 at 4 (E.D.Pa.1995), applied the same doctrine. McNemar claimed that his employment was terminated not because he had, as his employer claimed, violated store policy, but instead because he had AIDS. The court held that McNemar could not show that he was, with or without reasonable accommodation, able to perform the job in question, because he had sworn, on his applications for state disability and Social Security disability benefits, that he was "totally and permanently disabled." 1995 WL 390051 at 3. In addition, McNemar's physician had certified the same in order to exempt him from repaying his student loans. *Id.*

Thus, reasoned the *McNemar* court, McNemar was estopped from arguing that he is "qualified" to perform the job in question. *Id.* The court cited other cases reaching the same result:

[M]ost federal courts agree that an employee who represents on a benefit application that he is disabled is judicially estopped from arguing that he is qualified to perform the duties of the position involved. *See, e.g., August v. Offices Unlimited, Inc.,* 981 F.2d 576 (1st. Cir.1992) (plaintiff who certified on form for disability benefits that he was "totally disabled" was precluded as a matter of law from arguing that he was a "qualified handicapped person" under Massachusetts law); *Garcia–Paz. v. Swift Textiles, Inc.,* 873 F.Supp. 547, 554 (D.Kan.1995) (plaintiff with multiple sclerosis who certified on long-term disability benefits application that she was "unable to perform material duties of work" was estopped from arguing that she was qualified under ADA); *Kennedy v. Applause, Inc.,* 1994 WL 740765 (C.D.Cal. Dec. 6, 1994) (plaintiff with chronic fatigue syndrome who represented for purposes of obtaining disability benefits that she was completely disabled was estopped from arguing that she was qualified under ADA); *Reigel v. Kaiser Foundation Health Plan of N.C.,* 859 F.Supp. 963, 967–70 (E.D.N.C. 1994) (plaintiff with shoulder injury who claimed for purposes of receiving disability insurance payments that she was permanently disabled was estopped from arguing that she was qualified under the ADA).

1995 WL 390051 at 3; *cf., Matter of Davidson,* 947 F.2d 1294, 1297 (5th Cir.1991) (quasi estoppel precluded debtor husband from claiming that his payment obligations to nondebtor wife were not in the nature of alimony and thus were dischargeable, where husband had treated payments as alimony for tax purposes and his wife had reported same as income); *Matter of Nowak,* 183 B.R. 568, 570 (Bkrtcy.D.Neb.1995).

Quoting the *Reigel* court, 859 F.Supp. at 967–70 ("Plaintiff now seeks money damages from [her employer] on her assertion that she was physically willing and able to work during the same period that she was regularly collecting disability payments on her assertion that she was physically unable to work"), the *McNemar* court held that McNemar "cannot be simultaneously 'unable to work' and 'qualified to perform the duties of

his position.' " 1995 WL 390051 at *3. Once estopped, McNemar could not show that he was able to perform his job at all, irrespective of any accommodation. Accordingly, the court granted McNemar's employer summary judgment on his ADA claim. *See also Cheatwood,* 891 F.Supp. at 1538.

In this case Mr. Fussell admitted under oath that he is "[a] hundred percent" disabled within the meaning of the Social Security Act and therefore is receiving full disability benefits. Fussell Dep. at 87. The GPA points to that assertion in arguing that he is judicially estopped from arguing that he is qualified under the ADA. GPA's 7/24/95 Brief at 15; GPA's 8/29/95 Reply Brief at 12.

Plaintiff has not responded to this argument in his brief, but in his affidavit explains that when he applied for Social Security benefits he was unemployed at the time, could not find a job, and he was advised by counsel to apply. He admits that, as a result of his efforts, "Social Security has declared [him] 100% disabled." 8/12/95 Fussell Aff. ¶ 11 (Doc. 24 # 2).

The remainder of plaintiff's affidavit explanation consists of hearsay, his "understanding" of Social Security law, and his speculation that the Social Security Administration based its benefits award "on factors other than ability to work." *Id.* None of that, however, can be considered here. *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985) (on summary judgment, "[a]ll reasonable inferences arising from the evidence must be resolved in favor of the non-movant, but inferences based upon *speculation* are not reasonable") (emphasis added); *Marshall v. City of Cape Coral, Fla.,* 797 F.2d 1555, 1559 (11th Cir.1986); *Haysman,* 893 F.Supp. at 1105 ("hearsay evidence which is inadmissible at trial cannot be considered on a motion for summary judgment"); *Newhouse v. Probert,* 608 F.Supp. 978, 983 (D.Mich.1985); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane Fed.Prac. & Proc.Civil § 2738 at 486–94.

Applying the Supplemental Security Income (SSI) Program criteria, *see Sullivan v. Zebley,* 493 U.S. 521, 524–26, 110 S.Ct. 885, 888–89, 107 L.Ed.2d 967 (1989), a 100% disability rating implies that Fussell can neither perform at his old job nor "any other work that exists in the national economy, in view of his age, education, and work experience." *Sullivan,* 493 U.S. at 525–26, 110 S.Ct. at 888–89. To obtain those benefits plaintiff was required to swear under oath to the Social Security Administration (SSA) that he was permanently disabled within the meaning of 42 U.S.C. § 1382(a)(3).

However, there is no direct evidence in the record showing that Fussell swore to this fact. There is every reasonable inference that he did, given the working framework of the SSI program, but there is no dispositive evidence. But Mr. Fussell was not asked whether he swore to the SSA that he was permanently disabled, *see* Fussell Dep. at 87, nor was his SSI application obtained in discovery. It is conceivable, though not probable, that he made no such representation to the SSA but the SSA for some reason granted him permanent disability benefits anyway. Errors happen. Mr. Fussell, the nonmoving party on this summary judgment motion, must be granted that reasonable inference. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993) (explaining the shifting burdens of proof with respect to F.R.Civ.P. 56 motions post-*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

In that this matter in no small part implicates public policy, *see McNeill v. Atchison, Topeka & Santa Fe Ry. Co.,* 878 F.Supp. 986, 990–991 (S.D.Tex.1995) ("It was *not* the objective of the ADA, nor the intent of this Court, to facilitate, and ensure double recoveries for the exclusive benefit of a duplicitous Plaintiff or his misled or over-eager counsel"), the parties are granted 20 days from the date this Order is served upon them to conduct necessary discovery on this issue. While the GPA is entitled to summary judgment on the grounds set forth above, the Court also is inclined to grant the GPA summary judgment on these additional grounds. To that end, Mr. Fussell is directed to promptly provide to defendant all waiver and any other paperwork necessary to secure from the SSA his disability application materials and any other documentation revealing his representations to the SSA.

## I. Punitive Damages

Plaintiff does not challenge the showing made in the GPA's brief that, because the GPA is a state agency, *see Miller v. Georgia Ports Authority,* 217 Ga.App. 876, 460 S.E.2d 100 (1995), no viable claim for punitive damages exists. *See* GPA's 7/24/95 brief at 21–23; 42 U.S.C. § 12117(a) (incorporating Title VII standards in the ADA); *McClam v. City of Norfolk Police Dept.,* 877 F.Supp. 277, 284 (E.D.Va.1995); *cf., Colvin v. McDougall,* 62 F.3d 1316, 1319 (11th Cir.1995) (no punitive damages can be obtained against a sheriff's department). In fact, plaintiff concedes the point. Fussell brief at 1. In addition, this claim is foreclosed in any event because plaintiff's case in chief fails on the merits. Therefore, defendant also is entitled to summary judgment on plaintiff's punitive damages claim.

## III. CONCLUSION

This Court agrees with the *Pedigo* court's observation

> that the ADA as it [is] being interpreted [has] the potential of being the greatest generator of litigation ever ... [it is doubtful] whether Congress, in its wildest dreams or wildest nightmares, intended to turn every garden variety worker's compensation claim into a federal case.
>
> \* \* \* \* \* \*
>
> The court doubts that the ultimate result of this law will be to provide substantial assistance to persons for whom it was obviously intended. ... [O]ne of the primary beneficiaries of [the ADA] will be trial lawyers who will ingeniously manipulate [the ADA's] ambiguities to consistently broaden its coverage so that federal courts may become mired in employment injury cases, becoming little more than glorified worker's compensation referees.

*Pedigo,* 891 F.Supp. at 485–86 (footnote omitted).

The parties are granted twenty days from the date this Order is served upon them to conduct necessary discovery on the issue whether plaintiff is estopped from showing that he is qualified to perform the GPA employment he seeks because of inconsistent ability representations he apparently made to the SSA. The Court will be granting defendant summary judgment on the grounds set forth above following receipt of the submissions directed above. The Court at this time reserves judgment on the estoppel grounds discussed in Part II(H) *supra.*

**SO ORDERED.**